IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

KORY WATKINS and OPEN CARRY      )      4:14-CV-381-O
TARRANT COUNTY,                  )
    Plaintiffs,                  )
v.                               )      Evidentiary Hearing
                                 )
CITY OF ARLINGTON,               )
    Defendant.                   )      July 7, 2014

**BEFORE THE HONORABLE REED C. O'CONNOR**
*United States District Judge*
*In Fort Worth, Texas*


**FOR THE PLAINTIFF:**                **MR. WARREN V. NORRED**
                     *and*

                                      **MR. C. CHAD LAMPE**
                                      The Law Office of
                                         Warren V, Norred
                                      200 E Abram
                                      Suite 300
                                      Arlington, TX 76010
                                      817/704-3984
                                      Fax: 817/549-0161
                                      wnorred@norredlaw.com


**FOR THE DEFENDANT:**                **MR. ROBERT H. FUGATE**
                     *and*

                                      **MR. JAY DOEGEY**
                                      Arlington City Attorney's
                                         Office
                                      PO Box 90231
                                      MS 63-0300
                                      Arlington, TX 76004-3231
                                      817/459-6878
                                      Fax: 817/459-6897
                                      robert.fugate@arlingtontx.gov

COURT REPORTER:                    MR. DENVER B. RODEN, RMR
                                   *United States Court Reporter*
                                   1050 Lake Carolyn Pkwy #2338
                                   Irving, Texas  75039
                                   *drodenrmr@sbcglobal.net*
                                   Phone:  (214) 753-2298


     The above styled and numbered cause was reported by
computerized stenography and produced by computer.

```
 1        (July 7, 2014.)

 2           THE COURT:  All right.  We are here on case number

 3    4:14-CV-381, Kory Watkins versus the City of Arlington.  Who's

 4    here for the Plaintiff?

 5           MR. NORRED:  Warren Norred and Chad Lampe.

 6           THE COURT:  Okay.  Thank you.  And who's here for the

 7    City?

 8           MR. FUGATE:  Good morning, Your Honor.  Robert Fugate

 9    and with me is Jay Doegey, City Attorney.

10           THE COURT:  Okay.  Very good.  Thank you.

11           All right.  So, I guess the Plaintiff has the overall

12    burden on the injunction, but the City has the burden

13    substantively, it seems, on proving the interests involved and

14    the formulation of the ordinance in a way that serves the

15    appropriate interests, so I'll turn the floor over to whoever

16    would like to go first.

17           But let me just -- do you have any evidence to

18    present?

19           MR. NORRED:  Yes, Your Honor.  I have -- I'd like to

20    put Kory Watkins on the stand briefly.

21           THE COURT:  Okay.  Very good.  Do you have any

22    evidence to present?

23           MR. FUGATE:  No, Your Honor, other than the

24    ordinances that are in the record.

25           THE COURT:  Yes.  Of course.  Okay.  So then we will
```

1    start with you and you can call your first witness.

2           MR. NORRED:  Your Honor, it might be -- if I could,

3    I'd like to have some opening statement to -- before I put my

4    witness on.

5           THE COURT:  Well, why don't we go ahead -- Let's get

6    the evidence in and then we'll have argument.  I'll give you

7    plenty of time to make any argument you would like to make.

8           MR. NORRED:  Your Honor, I would call Kory Watkins.

9           THE COURT:  Okay.  Please come up.  Would you raise

10   your right hand and be sworn.

11       (Witness sworn by the Court at this time.)

12          THE COURT:  Very good.  Would you please come have a

13   seat on the witness stand.

14          THE WITNESS:  Thank you kindly.

15          THE COURT:  Yeah.  And speak good and loud into that

16   microphone.

17          THE WITNESS:  Testing.  Okay.

18              **KORY WATKINS, PLAINTIFF,** was sworn

19                   **DIRECT EXAMINATION**

20   BY MR. NORRED:

21   Q.  Mr. Watkins, could you introduce yourself to the Court.

22   A.  My name is Kory Watkins.  I'm living in Mansfield, Texas,

23   and I'm a coordinator and part of the Open Carry Tarrant

24   County group.

25   Q.  You filed suit to stop enforcement of this law.  Why do

1  you feel threatened by this law?

2  A.  I feel threatened and other people do as well in our group

3  because when we go out it seems like we're being harassed or

4  questioned about our actions with just specifically the Police

5  Department and the City Council of Arlington.  All the other

6  cities are very -- very okay with what we are doing and I just

7  feel threatened because they've threatened to arrest us,

8  they've threatened to cite us with tickets and stuff.

9  Q.  Describe your general practices of your group.

10  A.  Well, our group is a Second Amendment -- pro-Second

11  Amendment group and what we do, we go out on open carry walks,

12  we have flags, American flags.  We have signs, pocket

13  Constitutions and literature that talks about the laws here in

14  Texas on gun rights and when we go out we always make sure we

15  call law enforcement if it's our first walk or so just to give

16  them a heads up to let them know what we're doing.

17      We always make sure we're safe and sound as far as

18  our practices and if on a walk when we're out walking if

19  somebody wants our literature, we're -- you know, we hand it

20  to them.  It's -- it's a mutual agreement between two citizens

21  and it should be okay.

22  Q.  Has anybody ever been hurt on any of your walks?

23  A.  Never.  Nobody has ever been hurt.

24  Q.  How many of these walks have you personally been involved

25  in?

1    A.   Me personally?  At least 200 walks in the past year.

2    Q.   And how many walks have you been associated with in a

3    non-participatory -- not actually been on the walk but helped

4    organize?

5    A.   Hundreds and hundreds.

6    Q.   To your knowledge, has anybody ever been hurt?

7    A.   Never.

8    Q.   Anybody been cited for impeding traffic?

9    A.   Nobody has ever been cited for impeding traffic.  The only

10   time anybody has ever been cited for something was in

11   Arlington when they cited us for the 15.02(c) and at that time

12   nobody was impeding the traffic, they were just handing it to

13   them on the sidewalk.

14   Q.   That's the previous law prior to the amendment?

15   A.   That is the previous law.

16   Q.   So other than that -- and that was dropped; right?

17   A.   Yes.

18   Q.   Do you know why?

19   A.   I'm assuming because the city ordinance it was not valid

20   and they knew it.

21          MR. FUGATE:  Your Honor, I object to speculation.

22          THE COURT:  Overruled.

23   BY MR. NORRED:

24   Q.   Do you contend -- intend on continuing with these

25   practices?

1   A.   Absolutely.   There's a lot of people who support what

2   we're doing, law enforcement, elected officials, and a bunch

3   of citizens who are eager to join our walks and spread our

4   message.

5   Q.   How have you been damaged by -- has your organization

6   suffered because of the threat of enforcement?

7   A.   Well, not when we're outside of Arlington, but if we plan

8   to do a demonstration in Arlington.   There are definitely some

9   people who do not want to come because they could be cited or

10  arrested.

11  Q.   Your affidavit that we filed earlier had a letter from

12  Charlie Parker.   Who is Charlie Parker?

13  A.   He's a city councilman in Arlington.

14  Q.   What was the significance of that letter?

15  A.   I think he was trying to garner support but, you know, a

16  bunch of nasty things were said on there about us that we are

17  gangs and we are thugs.   You know, we have women and children

18  in our group.   We have law enforcement in our group.   We have

19  elected officials, military men and women in our group, so I

20  think we are far from a gang or thugs.   I think we are just a

21  bunch of individuals who are practicing and demonstrating our

22  Second Amendment right and spreading a message.

23        MR. NORRED:   No further questions.

24                    CROSS-EXAMINATION

25  BY MR. FUGATE:

1    Q.   Good morning, Mr. Watkins.

2    A.   Good morning.

3    Q.   Have you ever personally been cited for a violation of

4    either the current version of the Arlington ordinance or the

5    prior version of the ordinance as challenged in this lawsuit?

6    A.   Me personally?

7    Q.   Yes.

8    A.   No, sir.

9    Q.   Has any member of Open Carry ever been cited for the

10   amended version of the ordinance that was effective May 29th,

11   2014.

12   A.   Are you talking about the brand new one, sir.

13   Q.   The brand new one, yes.

14   A.   No, because we haven't been out there since that -- I

15   think we've been out there once or twice but we told our group

16   not to do anything because we know the ordinance is in effect

17   and we have a claim and we didn't want to mess with that.

18   Q.   Isn't it true that your group was out there on Little Road

19   just the Thursday before last?

20   A.   Yes, sir.

21   Q.   You mentioned that two citations were issued.  Those were

22   both based on the prior ordinance.  Isn't that correct?

23   A.   Yes, sir, they were.

24   Q.   And the City of Arlington dismissed both of those

25   citations.  Isn't that correct?

1    A.  Yes, sir.

2    Q.  Were you present at the time on May -- on March 27, 2014,

3    when those citations were issued?

4    A.  Yes, sir, I was.

5    Q.  And did you post a YouTube video of that event?

6    A.  Yes, sir.

7    Q.  Did you tape the video?

8    A.  Yes, sir.

9    Q.  And you narrated the video, isn't that correct?

10   A.  Yes, sir.

11   Q.  The title of the video is Arlington Police Threaten to

12   Arrest Us For Handing Out the Constitution.  Isn't that

13   correct?

14   A.  Yes, sir.

15   Q.  Okay.  The first person that was cited was Mason Yancey.

16   Is that correct?

17   A.  Yes, sir.

18   Q.  Did you see Mr. Yancey step into the street to hand a

19   Constitution to someone in a vehicle?

20   A.  I want to say yes, I did.

21   Q.  Was Mr. Yancey carrying a rifle that day?

22   A.  I believe it was a shotgun or a rifle.  It was a type of

23   long gun.

24   Q.  Do you know if the gun was loaded?

25   A.  I don't know if it was or wasn't.

1    Q.  Did you see Mr. Daniel Woods step into the street to hand

2    a Constitution to someone in a vehicle?

3    A.  He possibly could have.  From what I recall, he was just

4    handing it from the sidewalk, the grass area.  But he possibly

5    could have.

6    Q.  I said Constitution, but I think that day you were

7    actually handing out business cards of some type.  Is that

8    correct?

9    A.  We hand out business cards and Constitutions and pamphlets

10   that have the gun laws on them.  I can't recall exactly what

11   we were handing out that day but we are known for handing out

12   the Constitution, business cards, and a pamphlet that has to

13   do with gun rights.

14   Q.  Wasn't Mr. Wood the other person that received a citation?

15   A.  Yes, sir.

16   Q.  Do you know what kind of rifle Mr. Wood was carrying that

17   day?

18   A.  I want to say it was an AK 47.

19   Q.  Do you know if that AK 47 was loaded?

20   A.  I believe the magazine was loaded, from knowing Daniel --

21        THE COURT:  Well, do you know?

22        THE WITNESS:  I'm not a hundred percent clear, no.

23   BY MR. FUGATE:

24   Q.  Is that a semiautomatic rifle?

25   A.  Yes.

1    Q.   And earlier you spoke of the mutual exchange between

2    citizens where citizens wanted y'all's material.  Is that

3    correct?

4    A.   Yes, sir.

5    Q.   Do you think the fact that some of your members have

6    semiautomatic rifles on their shoulders affects that?

7    A.   I not clear of that.  There are a lot of people who

8    support us and ask us for our information, so I'm assuming

9    they want it.

10   Q.   Do you believe that some people are intimidated by the

11   fact that y'all are carrying loaded semiautomatic rifles?

12   A.   I'm assuming that everybody has different thoughts and

13   feelings on what we are doing.

14   Q.   On the day that Mr. Yancey and Mr. Wood were cited, did

15   the Arlington -- did some Arlington police officer ask you to

16   back away from the area?

17   A.   I was video recording with my son standing next to me and

18   an officer had came up and told me to back up and he put his

19   hand into my chest and assaulted me and at that time I -- I

20   just told him that where I was standing was fine and the

21   officer next to him told him to back down because he knew

22   where I was standing was fine.  It's shown on the video.

23   Q.   How old was your son that was with you that day?

24   A.   Six years old.

25   Q.   Did you refuse the officer's order to back up?

1  A.  I did.

2  Q.  And did you have a rifle that day?

3  A.  I did.

4  Q.  What kind of rifle did you have that day?

5  A.  AK 47.

6  Q.  Was it loaded?

7  A.  Yes, sir.

8  Q.  Did you have a round in the chamber?

9  A.  No, sir.  Never do.

10  Q.  Neither Mr. Wood nor Mr. Yancey were arrested.  Is that

11  correct?

12  A.  That is correct.

13  Q.  After Mr. Wood and Mr. Yancey were issued citations, you

14  whispered into your son's ear and instructed him to go out

15  into the street and hand materials to a car, didn't you?

16  A.  No, sir.

17  Q.  Did your son go out into the street and distribute

18  materials?

19  A.  He had handed some literature from the sidewalk, the grass

20  area.  Never went into the street.

21  Q.  Was that at your instruction?

22  A.  No, sir.

23  Q.  Was that with your permission?

24  A.  I didn't tell him to do it one way or another and he

25  didn't ask.  He did it on his own and I was okay with it.

1    Q.   Did you refer to the officers as thugs that day?

2    A.   Possibly, yes.  But I do apologize for that and --

3    Q.   Did you refer to the officers as dogs that day?

4    A.   Dogs?

5    Q.   Yes.

6    A.   I don't recall.  No, sir.

7    Q.   If the video shows that, you wouldn't dispute it; correct?

8    A.   I'm sorry.  What was that?

9    Q.   If the video that you posted shows that you referred to

10   the officers as dogs, you would not dispute that; correct?

11   A.   No, not at all.  I just don't remember using that direct

12   language.  I thought I said bullies and thugs but nothing

13   about a dog or anything like that that I can recall.

14   Q.   Did you make a statement that you guaranteed you wouldn't

15   be arrested that day?

16   A.   I would be arrested?

17   Q.   Did you make a statement on your video that you guaranteed

18   that you would not be arrested?

19   A.   Quite possibly.

20   Q.   If the video shows that, you wouldn't dispute it; correct?

21   A.   No.  Whatever the video shows that I said is what I said.

22   Q.   And your video -- your YouTube video channel is under the

23   name Kory Watkins.  Is that correct?

24   A.   Yes, sir, it is.

25   Q.   Okay.  And all of the videos that are on that channel are

1    videos that you have personally posted.  Is that correct?

2    A.  Yes, sir.

3    Q.  Okay.  And those are videos that you've personally taken?

4    A.  I'm going to say probably 99% of them.  There might be one

5    or two that I've uploaded from somebody else, but the majority

6    are, yes.

7    Q.  All of those videos are true and accurate.  They haven't

8    been photo shopped or animated or anything like that.  Is that

9    correct?

10   A.  They are all raw and uncut.

11   Q.  Did you post a video titled Mansfield Texas Police

12   Illegally Detain Open Carry Citizen?

13   A.  Yes.

14   Q.  Okay.  And so that's an example of at least some incident

15   happening outside Arlington where there was a disagreement

16   with police officers.  Is that correct?

17   A.  That has nothing to do with the ordinance.

18   Q.  It has something to do with open carrying rifles in

19   another city.  Is that true or not?

20   A.  Yes, but that's not why I'm here today.

21   Q.  The original incident that spawned the Open Carry movement

22   happened down around San Antonio or Austin.  Isn't that

23   correct?

24   A.  Temple.

25   Q.  Temple.  It did not happen in Arlington.  Is that correct?

1   A.   Correct.

2   Q.   Did you post a video on your channel titled Kory Watkins

3   Speaks At the 2013 Global Marijuana March in Fort Worth?

4   A.   Yes.

5   Q.   Do you think mixing marijuana use and carrying long rifles

6   would cause concern to police officers?

7   A.   I think that I'm here today for the Arlington city

8   ordinance and that has nothing to do with that.

9   Q.   Are you still advocating for the open use of marijuana?

10          THE COURT:   What's the relevance of that?

11          THE WITNESS:   To try to make me look bad.

12          THE COURT:   Hold on.   Only answer questions.

13          THE WITNESS:   My apologies.

14  BY MR. FUGATE:

15  Q.   When you talked about the fact that you all called the

16  police the first couple of times, one or two times, that you

17  go to a community, is it true that after that you don't alert

18  the police?

19  A.   Typically, if the police department -- we haven't had a

20  problem with them.   Say, for instance, like Keller.   We walked

21  there two times in Keller and we correlated with the police

22  department and talked with them and after the second time we

23  felt like our relationship was strong enough where we wouldn't

24  have to call and everything has been fine with what we're

25  doing in that particular --

1    Q.  Did you video one of the walks in Keller?

2    A.  Yes, sir.

3    Q.  And that was one of the main -- one of the top videos

4    posted on your channel.  Is that true?

5    A.  Yes.  Come Take a Walk With Us.

6    Q.  Okay.  And there's one point in that video where you

7    encourage one of the open members -- Open Carry members -- to

8    move into an interior lane of traffic.  Isn't that true?

9    A.  Yes.  There was a lady who wanted our information.  I got

10   a little bit excited and told Daniel to go get her.

11   Q.  What you said was get 'em, Daniel, get her?

12   A.  Yes.

13   Q.  And traffic was starting to move at that time, wasn't it?

14   A.  I believe the light had just turned green and he handed it

15   to them and came back just before the other cars started

16   moving.

17   Q.  Isn't it true you often interact with drivers not just the

18   passengers of vehicles?

19   A.  We interact with anybody who is wanting our information.

20   Q.  Including people behind the wheel, isn't that correct?

21   A.  It doesn't matter who they are.  We interact with anybody

22   who wants our information.

23   Q.  You agree with me that could be distracting to drivers?

24   A.  They're not driving at the time.  They are parked at a red

25   light, so I would disagree.

1  Q.  Is your testimony in court that you all never try to

2  attract the attention of moving vehicles?

3  A.  What was that?

4  Q.  Do you ever try to attract a driver while a vehicle is

5  still moving?

6  A.  While a vehicle is moving do we try to attract drivers?

7  No.

8  Q.  Have you ever been cited anywhere for a violation of the

9  Texas Transportation Code Section 552.007?

10  A.  I don't know what is in that, so I can't say if I have or

11  if I haven't.

12  Q.  Do you know if anyone in Open Carry has ever been cited in

13  Arlington for a violation of any provision of the Texas

14  Transportation Code?

15  A.  The only thing that I know that the people have been cited

16  for in Arlington that has to do with our organization and our

17  demonstrations is the ones we've talked about already which is

18  Daniel and Mr. Yancey and they've both been dropped, both --

19  Q.  And that was the prior version of the Arlington city

20  ordinance; correct?

21  A.  Yes, sir.

22       MR. FUGATE:  Nothing further.

23       MR. NORRED:  No further questions, Your Honor.

24       THE COURT:  Okay.  You may step down.

25       THE WITNESS:  Thank you, sir.

1      THE COURT:  Do you have any other evidence?

2      MR. NORRED:  No evidence, Your Honor.

3      THE COURT:  And do you have any evidence that you

4  would like to present now that they've rested their

5  evidentiary presentation?

6      MR. FUGATE:  Your Honor --

7      THE COURT:  I mean, I take notice of the ordinance,

8  so that's -- I don't -- that's not an issue.

9      MR. FUGATE:  No, I don't, Your Honor.  That's it.

10      THE COURT:  But if you have other evidence, I want

11  you to have the opportunity to present it at this time.  I

12  don't want to restrict either party's opportunity to present

13  any evidence that they believe is relevant.

14      MR. FUGATE:  I understand, Your Honor.  I'm going to

15  stand on the ordinance.

16      THE COURT:  Yes.  Okay.

17      MR. NORRED:  Your Honor, I'm assuming that you're

18  taking judicial notice of the state law --

19      THE COURT:  Yes -- well, of course.  Yes.  So no more

20  evidence?

21      MR. NORRED:  That's correct.

22      THE COURT:  All right.  Very good.  I'll turn the

23  floor over to you now.

24      MR. NORRED:  Your Honor, we're going to look today at

25  a few laws and I'm prepared to talk to your electronic system

1  here but I don't think your electronic system is prepared to

2  talk to me, so I'm going to give you, if it's okay, and I've

3  given this to the Court.  If I might approach the Court.

4      (Documents handed to the Court.)

5          MR. NORRED:  What I've given you, Your Honor, is a

6  copy of the Transportation Code ordinance that was not

7  challenged at the trial level in the *Houston Chronicle* case

8  but is being challenged in this case which distinguishes it

9  from --

10          THE COURT:  Well, you're not -- you're not

11  challenging it, necessarily.  You're saying it's a part of the

12  ordinance in this case that makes it content specific.

13          MR. NORRED:  Correct.  Correct.

14          THE COURT:  You're not asking me to declare this

15  unconstitutional?

16          MR. NORRED:  Not at all.

17          THE COURT:  Right.

18          MR. NORRED:  Not at all.

19          THE COURT:  All right.  I'm with you.

20          MR. NORRED:  Okay.  And this is just a -- for easy

21  purposes of discussion, a comparison of the first ordinance

22  that was in effect from 1995 until this year and then a copy

23  of the ordinance as it stands and a copy of the League City

24  ordinance that was at issue in the *Houston Chronicle* case.

25          Now, I can talk at length ad nauseum on the

1   standards, I'm assuming the Court knows all of that, and so

2   I'll just go through them quickly.

3          THE COURT:  I'm not restricting you in any way.

4   Just --

5          MR. NORRED:  Okay.

6          THE COURT:  Whatever presentation you would like to

7   make, I want to give you the opportunity to make it and then I

8   will give the City the same.

9          MR. NORRED:  I appreciate that, Your Honor.  But I'm

10  going to spend obviously some more time on some more than

11  others.

12         Of the four elements, likelihood of success,

13  irreparable injury, denial of threatened injury, outweighing

14  the harm of injunction, and the injunction not disserving

15  public interest, both of us have agreed that those are the

16  elements in our pleadings.  A couple of these are give-mes,

17  almost.

18         Injunction.  I'll just start with the fourth one.

19  Injunction will not disserve public interest.  Obviously,

20  political discourse serves the public.  I found an excellent

21  case last night and we've argued this but the *Texans For Free*

22  *Enterprise v Texas Ethics Commission* at 732 F.3d 535 states --

23  and this is talking about a post *Citizens United* case.  I have

24  a copy of it.  I've given you the cite, if I might.

25         (Document handed to the Court.)

1          MR. NORRED:   On the last page of this brief opinion,

2     the Fifth Circuit says, We have repeatedly held however that

3     the last of First Amendment freedoms for minimal periods of

4     time constitutes irreparable injury justifying the grant to

5     preliminary injunction.  And then that second highlighted part

6     the Commission is saying that it's going to be harmed.

7          The Fifth Circuit says it notes that same vague

8     unsupported anticorruption grounds to the contrary injunctions

9     protecting First Amendment freedoms are always in the public

10    interest.  Always in the public interest.

11         So we think that irreparable injury, element two and

12    four, injunction will not disserve public interest, are met

13    with ease.

14         Denial of threatened injury outweighs harm from

15    injunction.  Your Honor, this Court, the City had the same law

16    from 1995 until the middle of 2014.  To my knowledge and to

17    all of what we can find, exactly two citations were given out

18    under that ordinance, both of them dropped, and both of them

19    made against Open Carry members as discussed so far.

20         Opposing counsel makes much of or attempts to make

21    much of the fact that the new law is less restrictive than the

22    old law.  The old law was boldly unconstitutional under any

23    analysis.  It forbade every interaction from any street of any

24    type.  It can't pretend to be constitutional and it was never

25    enforced until Open Carry.

1          It is difficult to say, I cannot articulate how they

2    can possibly suggest that the denial of threatened injury

3    outweighs harm from injunction.  All we're asking for is the

4    status quo which is stop enforcing unconstitutional laws and

5    allow -- if the City wants to go back and craft a reasonable

6    law that meets with the Constitution, they can do that.  But

7    there's never been an injury.  And this is going to separate

8    us from Houston Chronicle in just a minute.

9          We might as well get to that.  Likelihood of success.

10   Likelihood of success is -- for the injunction and for the

11   case is clearly the most difficult element to meet.  The case

12   law says we just need to prove a facial case.  We don't need

13   to proof sufficient for a motion for summary judgment.

14         The City of Arlington cites *Houston Chronicle* and I

15   have a copy for you.

16         **THE COURT**:  I have it.

17         **MR. NORRED**:  Outstanding.  Mine is highlighted for

18   you.  But if we can look at the law, we can see some

19   distinguishing characteristics immediately.  And you can kind

20   of see this in the ordinance comparison I gave you in a minute

21   and it's also on page two of the opinion, if your printout is

22   like mine.  But it says no person who is within a public

23   roadway may explicit or sell or distribute any material to the

24   occupant and it continues on, so long as he or she remains on

25   the surrounding sidewalks, unpaved shoulders, and not enter on

1    the roadway itself including medians or islands.  The Houston

2    law allows you to stand on the street or on the curb and hand

3    material to somebody who's in the outside lane without

4    violation of the law.  So 80% of the time or some

5    percentage -- a very high percentage of the time Open Carry

6    members are sitting or standing on the sidewalk and they are

7    handing things to people who are stopped at red lights.

8    Perfectly legitimate, perfectly acceptable under the Houston

9    law.  The Arlington law doesn't allow that.

10           Thank you.

11           Some other substantial differences.  Houston had an

12   actual accident in a nearby town that sparked the discussion.

13   They had studies.  It was a long discussion in which the city

14   was not responding to a particular group.

15           In our case the City is responding specifically to

16   the Open Carry movement.  As the City's attorney so adroitly

17   demonstrated in his last line of questions, they are much more

18   concern about showing respect to police officers and following

19   rules that they lay down than they are actually making sure

20   that somebody is safe with handing out literature.  About half

21   the questions that I just heard were all about showing

22   disrespect and carrying weapons.

23           Although, obviously, we cannot divorce the Second

24   Amendment from this discussion, because what's the group is

25   attempting to do, I would ask the Court to release that

1    because that's not really part of the case.  There's no

2    allegations that Open Carry has ever violated a gun oriented

3    law or any allegations that what they're doing is illegal.

4    Unto the contrary, there is a motion afoot to actually

5    accomplish what these guys are trying to do.  They opine and

6    they fight for open carry use of weapons which is an ongoing

7    discussion.

8         I would suggest that it's easier to make a rational

9    discussion of this if we divorce the political speech, which

10   is clearly political speech, and just recognize it in theory

11   as political speech.  This could be Hare Krishnas handing out

12   pamphlets at corners, this could be large black members of the

13   Teamsters Union handing out MLK, civil rights literature.  It

14   could be anybody.  But all you hear about from the City is,

15   Well, these guys have guns.  That's not the issue.  The issue

16   is is this an unconstitutional violation of a restriction on

17   free speech and we agree we think that it is.

18        Some other important differences from the *Houston*

19   *Chronicle* case.  The *Houston* case had the district court

20   finding that there's no content-based discriminatory intent.

21   No content-based discriminatory intent.  Your Honor, the City

22   says we have to let the firefighters go out to do their thing

23   because the state law says we have to.  Yes.  Sort of.  State

24   law, and I've given you a copy of the law, says that

25   firefighters or any organization if they're being otherwise

1    prevented, it establishes a maximum regulation for preventing

2    and regulating state employees who wish to do these kind of --

3    these kind of activities.  It says you've got to tell them how

4    many people are going to be there, where they're going to be,

5    and this is all right there in the law.  When they are going

6    to be there.  It's very detailed.  And, oh, by the way, you

7    have to put up a million dollar bond.

8         Now, the City doesn't ever really do any of that.  It

9    just doesn't.  The City just says, Well, the state says we

10   have to let the firefighters do what they want and the

11   firefighters do what they want.  So the state law does say

12   that the City has to allow the firefighters to do something

13   but in practice it's not requiring any of that.  In practice,

14   the City is allowing the firefighters to do whatever they want

15   and that's not what the --

16        **MR. FUGATE:**  Your Honor, I object.  There's

17   absolutely no evidence in the record about what the City does

18   or doesn't do with respect to the firefighters.

19        **THE COURT:**  Okay.  I will need you to stand up when

20   you address the Court.  Overruled.

21        **MR. NORRED:**  I believe we have an affidavit that says

22   that we did look for that.

23        Nonetheless, that's been the argument by the other

24   side, that they don't have to -- that they have to allow them

25   to do that.  If the City wanted to, the City could say

1    everybody has to have a million dollar bond.  Everybody has to

2    follow all these rules that are outlined in the state law.  We

3    would get away from a content viewpoint at that point and we

4    would still have the question of whether or not these are

5    reasonable restrictions time, manner, or place.  But we get

6    away from the time content restriction.

7              The other -- another major question we are going to

8    see here is that in the *Houston Chronicle* case, as I mentioned

9    earlier, the -- it was only at the appellate level that the

10   City made the argument regarding the content viewpoint of the

11   firefighters law and we're making that here.

12             In the *Houston Chronicle* case you also have a

13   discussion by the Court that no one's ever cited that Houston

14   Chronicle, there was never ever real danger to the Houston

15   Chronicle, nobody made any arrests, nobody made any citations.

16   There was no real danger of anybody suffering under this law.

17             And the *Houston Chronicle* Court talks about this.  Of

18   course, in our case we have actual citations.  And the

19   citations are significant because they are the only two

20   citations anybody has ever heard of on the basis of this law.

21   And as the Court has heard, police officers have told members

22   of Open Carry that they are going to be cited and they've done

23   it before with the existing law, so we have the actual threat

24   of arrest or citation that we did not have in the *Houston*

25   *Chronicle* case.

1          In fact, and I'm quoting from the opinion, The

2     district court did not find that the City ever prosecuted or

3     threatened to prosecute the newspapers under the law in

4     question.

5          More discussion with constitutional harm adequate to

6     satisfy the injury effect requirement.  It's a specific

7     statement made in the opinion.

8          And then the Court did find -- and I'm not saying --

9     we're not arguing that the Court -- that the City of Arlington

10    has to wait until somebody is run over to make a -- to pass a

11    law.  But when a law is passed for the specific purpose of

12    prohibiting or restricting the free speech of a particular

13    group we think it steps over the line.  None of that was the

14    case in the *Houston* case.  In fact, it says the Court -- in

15    the opinion the City demonstrated at trial the newspaper's

16    treatment or in nearby cities had been seriously injured or

17    intersections similar to the street in question.

18         And then when it does talk about the City -- the

19    Texas Transportation Code firefighting law, it says, that

20    wasn't brought up earlier, so we're not going to talk about

21    it.

22         I welcome any questions regarding any of these facts

23    or questions.  I've got copies of the case law highlighted at

24    the various points.  I could talk about the videos and how

25    they are -- if someone was trying to argue that we should make

1    a law preventing strollers from being on the sidewalks, that

2    would be fine.  But you will find a number of these videos

3    were picked up after the fact.  The City decided it wanted to

4    do something to stop Open Carry from being comfortable in

5    handing out Constitutions, so they passed this law and, of

6    course, we have challenged it and now they try to shoehorn all

7    this reasoning in, Oh, no, we're trying to -- it's all that

8    public safety, because they know that's the magic word.  But

9    the fact is they didn't do any public safety analysis and half

10   the videos they are talking about were taken after the fact.

11            And even the videos, if the Court -- and we welcome

12   the Court's examination of these videos, we don't have any

13   problem with that at all, the characterization, Well, he is

14   doing these danger things, a pickup passes a person walking

15   out to an street, Well, that's close to a pickup.  The pickup

16   is passed.  Now, we've got over 100 hours of video on various

17   Open Carry walks in front of various people and they found one

18   incident where one person was in the -- was in the lane.  That

19   was many months ago.  And as -- as you've heard the testimony,

20   they don't -- that's not what they are characterized by and

21   there is plenty of video to look at.

22            So we welcome any questions the Court has.

23            **THE COURT**:  You said that the *Chronicle* case -- the

24   *Houston Chronicle* -- from -- that the portion of that

25   ordinance that remained after all the repeals that was found

1    acceptable permitted the person to distribute newspaper to

2    persons in the outside lane.

3             MR. NORRED:  That's correct, Your Honor.

4             THE COURT:  Do you agree that the City could limit

5    distribution to the outside lane?  Do you think that would be

6    reasonably or narrowly tailoring a narrow -- a narrow

7    tailoring of the provisions?

8             MR. NORRED:  Your Honor, I don't -- it certainly

9    would be much less onerous than saying no interaction.

10   Certainly, it would be closer.  I'm not sure I can draw that

11   line just like that.  One of the problems that I have with it

12   is that it has -- it says they have to be legally parked.

13   Earlier, I asked my client the question.  So if -- if this --

14   even into the *Houston* case, if -- we're in the Arlington case.

15   Let's say I pull up to a red light and Mr. Watkins is out

16   there and he says, Well, I can't give you the Constitution

17   unless you put it in park.  Well, now you've put it in park.

18   Is it legally parked?  I don't know if it's legally parked or

19   not.  But now certainly I can hand him the Constitution and he

20   is parked.  I don't know if he is legally parked.

21            THE COURT:  But you can't do that under this

22   ordinance.

23            MR. NORRED:  No, I can't --

24            THE COURT:  On -- in the -- at least in the areas

25   identified under Section 15.

1          MR. NORRED:  I think that the current ordinance would

2     allow me, if I'm legally parked on any of these arterials --

3     and I don't know what it means to be legally parked -- but I'm

4     fairly certain there's a statement in the law that says unless

5     he's legally parked and if he is legally parked he can receive

6     the materials.  Oh, it doesn't say it here.  I think it's

7     somewhere else.  But it's -- but if you are illegally parked

8     in the street -- in the old ordinance it says other than a

9     lawful parked vehicle.  Oh, yes.  Other than a lawfully parked

10    vehicle, at the very end of the new amended ordinance.  So if

11    somebody pulls up -- as this law is written right now and puts

12    their car in park at the red light, then Mr. Watkins's group,

13    if there's a determination it's lawfully parked -- again, I

14    don't know what that means -- they can hand them the

15    Constitution.  I find that to be strange.

16          To me, what is the goal?  The goal is public safety.

17    So, there's already a law that says you can't impede traffic,

18    and as my client has testified, no one has ever been accused

19    or cited for impeding traffic and these police officers come

20    out and watch these guys all the time.  So if nobody has ever

21    cited them for what seems to be a fairly obvious law, not

22    impeding traffic, that's certainly something we can all get

23    behind, then why do we need this?  This is not narrowly

24    tailored.  In the *Houston Chronicle* think they are trying to

25    stop people from vending -- in fact, the *Houston Chronicle*

1    case cites the *Hare Krishna* case.  In the *Hare Krishna* case

2    you have people stopping traffic because they were getting out

3    change and paying for the things, and that's discussed in the

4    *Hare Krishna* case -- which I have a copy of if you would

5    like -- and so that's discussed as a major issue.  It stops

6    people.  We're not doing that.  Nobody is buying anything.  In

7    the *Houston Chronicle* case they talked about you've got to

8    make change to buy this newspaper.  We don't have that problem

9    here.  The only problem is are you handing things to people

10   while it's a moving car and you have a law that will stop

11   people from doing that, that you're impeding traffic if you

12   are doing that.  So why do we have to have this other law?

13   What's the point of this other law?  This point -- this other

14   law is only to stop free speech.  That's what it's all about.

15   It's not about public safety.  If they want to do that, then

16   you will cite them for impeding traffic.  They already have

17   that law.

18          Did I answer your question?

19          THE COURT:  Let me ask you this.  Do you agree that

20   the government has a legitimate interest in promoting public

21   safety and the unobstructive use of sidewalks and roadways?

22   Do you agree with that?

23          MR. NORRED:  Certainly.

24          THE COURT:  And so your contention here -- and that

25   that is at least a significant government interest?

1          MR. NORRED:  At least a significant.  Sure.

2          THE COURT:  And so your contention here is that, one,

3    this is a content-based ordinance and so they have to meet

4    even -- an even higher standard, a compelling government

5    interest, and you believe that it is content-based, you told

6    me a moment ago, because they passed it to make your group

7    uncomfortable.

8          Are there any other arguments or evidence?  Do you

9    have any other evidence that would show that this ordinance

10   was redrafted to target your client?

11         MR. NORRED:  We've got no evidence that I've entered.

12   We had the Charlie Parker letter.  He's a city council member.

13   That's part of the affidavit.  That's part of the record.

14   It's -- and it just shows that there's been a concerted

15   effort -- and -- Let me back up a little bit.  The *Houston*

16   *Chronicle* case, that law was sparked by an accident that

17   occurred in nearby cities.  Something causes city councils to

18   do things.  They don't -- they have lots of things to do.

19   This law was perfectly unenforced and unconstitutional for

20   eighteen plus years.  Nobody had a problem.  Open Carry starts

21   being active in Arlington and now it's a crisis.  We've got to

22   pass a law immediately.  The idea that this is anything but a

23   react but Open Carry to me is laughable on its face.  Clearly,

24   it was meant to do this.

25         THE COURT:  Let me ask you this.  Is there anything

1   from the text of the amended ordinance that would indicate

2   that it is directed at Open Carry?

3          MR. NORRED:  Yes, Your Honor.  I underlined the new

4   and improved amended -- right there in the middle of the

5   page -- they added the statement for purpose of an exchange

6   with the occupants of a vehicle.  That's new language.

7          THE COURT:  But how -- my question -- I understand

8   that.

9          MR. NORRED:  Right.

10          THE COURT:  I've compared it as well.  My question to

11   you is how do I read that text and then conclude that, Oh,

12   this clearly targets Open Carry and Mr. Watkins?

13          MR. NORRED:  Well, if you are asking if it's a

14   facial -- a facially neutral law, I think it is a facially

15   neutral law, if you ignore the Texas Transportation Code.  So

16   if that's your question -- I think it's facially neutral -- if

17   this had popped up before Open Carry was active, I don't know

18   that anybody would have had anything to say about it.

19          THE COURT:  And so you say it's -- the ordinance

20   itself is facially neutral.  It's not facially neutral if I

21   consider the Texas Transportation Code in which case it's

22   content-based, it allows people by firemen or actually city

23   employees and not by people not employed with the city.

24          MR. NORRED:  I would go further than that though

25   because the City has not -- it certainly hasn't shown that

1   it's enforcing that.  There's no great -- anything in the

2   record that says that firefighters even are required to do

3   that much.

4        THE COURT:  No, I understand what you mean.  Yeah.

5   You are saying they are not even requiring that.

6        MR. NORRED:  That's just a talking point.  It's not

7   real.

8        THE COURT:  Right.  And so -- and so in terms of the

9   time, place, and manner, it is your argument that under either

10  the content-based standard or the content-neutral standard

11  they have not sufficiently tailored this law in a way that

12  alleviates whatever problem or perceived problem they have

13  identified.

14       MR. NORRED:  That would be correct, Your Honor.

15       THE COURT:  Do you have any other -- Okay.  So the

16  tailoring aspect of it.  If I find it's content-based or

17  content-neutral, under either one, you clearly have a problem

18  with the tailoring aspect.

19       Do you have any other argument as to why I should

20  conclude that this violates the First Amendment?

21       MR. NORRED:  Your Honor, at this time I've conveyed

22  to you I think the bulk of the presentation.  Of course, our

23  written documents have a lot more than this, but I've

24  addressed -- I'm just trying to address what I think are the

25  strongest points of the other side and that's the likelihood

1  of success and pointing out that the *Houston Chronicle* case is

2  not controlling in our case.

3      THE COURT:  Right.  Right.

4      MR. NORRED:  So --

5      THE COURT:  Right.  Okay.  All right.  Very good.

6  Thank you.

7      MR. NORRED:  Thank you.

8      THE COURT:  Well, let me ask you this.  I'm sorry.

9  Have you seen or -- do you have any evidence or have you or

10  your client, have you seen anyone in any of these areas

11  violating the amended Section 15.02?

12      MR. NORRED:  Your Honor, I am not a constitutional

13  scholar, but I was told that if our client was cited with a

14  criminal trespass or criminal citation of some sort it might

15  confuse --

16      THE COURT:  I'm not talking about your client.  I'm

17  talking about like there's a -- there's a big carve out here

18  it looks like around games at the ball park or at the Cowboys

19  Stadium or at the Convention Center.  Have you seen people

20  interacting and exchanging, hailing cabs or anything like that

21  within two hours of games or convention centers?

22      MR. NORRED:  Your Honor, I saw that.  We haven't seen

23  anything like that.  We have -- we don't -- we haven't

24  concentrated our efforts on anything like that.

25      THE COURT:  Okay.  Very good.  All right.  Thank you.

1          MR. FUGATE:  Good morning, Your Honor.  I want to

2     talk just a little bit about the history of the spring and the

3     history of our ordinance.  The ordinance at issue was adopted

4     in 1994 and that is about two decades before Open Carry ever

5     existed, so the argument to the effect that Arlington somehow

6     came along and created this ordinance just to discriminate

7     against this group doesn't make sense.

8          THE COURT:  Well, they're not saying that.  They are

9     saying you amended it to discriminate against the group

10     because you arrested or at least ticketed two of their people.

11     Their argument is someone in Arlington determined this is

12     unconstitutional and so you added language in here to target

13     them.  Do you take their argument to be that in 1994 Arlington

14     crafted this ordinance to anticipate their arrival in 2013?

15          MR. FUGATE:  I think much their argument has been

16     that the City specifically targeted them and by pointing

17     out --

18          THE COURT:  True.  Very true.

19          MR. FUGATE:  And pointing out that the ordinance was

20     initially adopted two decades ago I think is pretty strong

21     evidence that we didn't have a psychic ability to predict

22     Kory Watkins and Open Carry were going come to our corners

23     with guns.  We did not know that.  Many other cities have

24     similar ordinances.  What happened this spring was that the

25     group did come to Arlington and we did issue two citations and

1   the group threatened to sue Arlington and we stepped back and

2   we said we are going to put a moratorium on enforcing this

3   ordinance and that's why there were no additional citations

4   were issued.  We wanted to step back and look at the

5   ordinance.

6          When we did step back and look at the ordinance what

7   we saw was that the provision for distribution of literature

8   was separated out and treated differently than commercial

9   solicitations.  And stepping back and having had the benefit

10  of two extra decades of case law, we looked at this, we looked

11  at all the law, and we decided this needs to be changed.  The

12  City of Arlington changed the ordinance.  It was certainly

13  prompted by the threat of a lawsuit.  We voluntarily went back

14  and looked at the ordinance and we changed it.  And in their

15  original complaint their argument is they've only taken one

16  section of the prior ordinance and they are comparing one

17  section without comparing the whole thing to the new ordinance

18  and then saying that we only added the distribution section

19  in.  But finally in their reply brief to our response they

20  admit in a footnote, footnote 1, that the new ordinance is

21  less restrictive than the old ordinance.  So on the one hand

22  they are complaining that we have is somehow targeting them

23  out and on the other hand they are admitting that we have made

24  our ordinance less restrictive.  We've made it less

25  restrictive by insuring that the distribution of literature is

1    treated like any other form of solicitation.  Out ordinance is

2    narrowly tailored, it only focuses on listed intersections,

3    and there are nine stretches of roadway in Arlington that are

4    very busy such as Cooper, Collins, Abram.  We've identified

5    those streets and we've identified some intersections.  And

6    that is our narrow tailoring.

7         THE COURT:  Do you believe that First Amendment

8    jurisprudence distinguishes between the disruptive effects of

9    solicitation versus distribution?

10        MR. FUGATE:  That's a really interesting question.

11   And I went back and I looked and I found five cases that are

12   on point that talk about that.  The earliest case that I found

13   is *International Society For Krishna Consciousness v the City*

14   *of Baton Rouge*, and that case is 876 F.2d. 494, Fifth Circuit

15   1989.  In that case the ordinance only involved solicitation

16   and it did not involve the distribution of literature.  But it

17   affected every street in Baton Rouge.  It wasn't selected

18   streets.  At that time in 1989 the Fifth Circuit found that

19   that -- that ordinance was constitutional.  But they did note

20   that solicitation was not a factor.

21        The next case that we have from the Fifth Circuit is

22   the case that we've relied on heavily that we stayed and tried

23   to model and that is the *Houston Chronicle Publishing* case

24   which is Fifth Circuit 2007.  That case does involve -- the

25   ordinance has language that's both solicitation and

1    distribution.  And I think there's a question about whether or

2    not it was limited to the outside lane or not.  My reading of

3    that case is that it's not limited to the outside -- to any

4    certain lane.  But what the language said was no person who is

5    within a public roadway may solicit or sell or distribute any

6    material to the occupant of any motor vehicle stopped on a

7    public roadway in obedience to a travel control signal, and so

8    that case clearly encompasses distribution of literature.

9         The Fifth Circuit also said that it's not merely a

10   compelling interest -- not merely a significant interest that

11   would be required for a time, place, and manner restriction,

12   but public safety is a compelling interest, so it would meet

13   even the highest threshold not have in a content-neutral

14   regulation.

15        THE COURT:  So you are saying in the *Houston*

16   *Chronicle* case that they could not distribute a newspaper from

17   the sidewalk?  Are you saying this?

18        MR. FUGATE:  That's the way that I read the revised

19   version of the ordinance that was affirmed.

20        THE COURT:  That they could not distribute a

21   newspaper --

22        MR. FUGATE:  At the traffic controlled intersections.

23        THE COURT:  From the sidewalk?

24        MR. FUGATE:  That's how I read it.

25        THE COURT:  Well, how does the ordinance -- if the

1    ordinance says no one can distribute within a roadway how does

2    the ordinance then prohibit at that intersection someone

3    submitting -- distributing a newspaper not from within a

4    roadway?

5         MR. FUGATE:  The rest of the ordinance says it is

6    specifically provided, however, that a person other than a

7    person twelve years of page or younger may solicit or sell or

8    distribute material to the occupant of a motor vehicle on a

9    public roadway so long as he or she remains on the surrounding

10   sidewalks -- I'm wrong on that.

11        THE COURT:  Right.

12        MR. FUGATE:  As long as you are not in the roadway

13   you can hand it off.

14        THE COURT:  That -- it gets me to this point.  You

15   say the City of Arlington relies heavily on the *Houston*

16   *Chronicle* case because your ordinance prohibits anyone from

17   doing any of these prohibited things if he stands on or in any

18   manner occupies a shoulder, improved shoulder, sidewalk,

19   median, or public right of way in the area set out in Section

20   15.03 whereas the *Houston Chronicle* case that the Fifth

21   Circuit approved said that no person who is within a public

22   roadway may do these things but that they could do these

23   things, as you mention at the end, so long as they remain on

24   the sidewalks.

25        And so explain to me what evidence exists that the

1    City in relying on the *Houston Chronicle* case narrowly

2    tailored their argument -- their -- their ordinance in such a

3    way that they found it necessary, under either standard,

4    necessary to not only prohibit anyone from going into the open

5    roadways but also they couldn't do that from a shoulder,

6    improved shoulder, or sidewalk, because *Houston Chronicle*

7    prohibits it from the median as well.

8         **MR. FUGATE:**  There are a couple of things, Your

9    Honor.  Our ordinance is not add broad as the *Houston*

10   *Chronicle* ordinance.  We have identified the busiest traffic

11   intersections.  We have identified specific sections of

12   roadway, so we're not even applying it to every intersection

13   that's controlled by a traffic light.  And the other thing is

14   that as these videos show -- I mean, you can come into court

15   with the rose colored version, but they are not limiting

16   themselves to standing on the sidewalk and handing stuff off.

17        **THE COURT:**  Well, then let me ask you this.  Is there

18   an existing traffic ordinance either with the Texas

19   Transportation Code or a city ordinance that prohibits people

20   from entering the roadway or -- against the light.  In other

21   words, if the -- if the sign says do not walk, is it -- can

22   you ticket someone who walks into the roadway when the sign

23   says do not walk?

24        **MR. FUGATE:**  Absolutely.

25        **THE COURT:**  And so why then is the fact that you see

1    them walking into the roadway when they shouldn't be, why do

2    you need to enact the ordinance in this fashion if you already

3    have an ordinance that would permit you to ticket them

4    irrespective of their speech, ticket any person?

5         MR. FUGATE:   This is -- you know, this is not a

6    situation where people are crossing at crosswalks.  If you

7    look at the videos, they are typically far away from the

8    crosswalks --

9         THE COURT:   Well, isn't that a violation in and of

10   itself?  Is there not either a city ordinance or a Texas

11   transportation accordance that says you, a pedestrian, can

12   only go into the streets at designated cross walks?

13        MR. FUGATE:   I'm not sure about that, Your Honor.

14        THE COURT:   Okay.  Well, in Dallas they are ticketing

15   everybody for jay-walking down there.  It's either a Texas

16   transportation ordinance or a City of Dallas ordinance.  I

17   would be surprised Arlington doesn't have a similar ordinance.

18   But didn't the Supreme Court two weeks ago rule that in the

19   *McCullen v. Coakley* case rule that these kinds of existing

20   ordinances, these -- so in this case traffic ordinances, those

21   kinds of existing ordinances are narrowly tailored, less

22   intrusive on First Amendment rights methods for the City to

23   achieve their interests, compelling interest, significant

24   interest, whatever it is, the interest that counsel agrees you

25   all have?

1          MR. FUGATE:  Well, *McCullen* involved a buffer zone

2    and to some extent I agree there was some general language

3    that talked about using less restrictive means.

4          THE COURT:  Well, what do you mean general language?

5    Wasn't that the heart of the case?  The heart of the case was

6    we're not finding this content-neutral, we're not dealing with

7    this on an as applied basis.  We can decide this case only on

8    the narrow tailoring of this ordinance and this hasn't been

9    narrowly tailored because of the length and the justifications

10   that the state puts up aren't -- don't really have merit

11   because they have all these other alternatives to achieve

12   these results.  Now, it may be more difficult for them to do

13   that.  But in the First Amendment context, when we are

14   protecting what -- at least among the first ten are our most

15   cherished rights, we need to insist that the city --

16         MR. FUGATE:  I think one place to start when you are

17   comparing *McCullen* to this situation is that *McCullen* didn't

18   involve a content-neutral regulation.

19         THE COURT:  *McCullen* did what?  I'm sorry.

20         MR. FUGATE:  It did not involve a content-neutral

21   regulation because --

22         THE COURT:  Didn't the majority say it was

23   content-neutral?

24         MR. FUGATE:  I thought not.

25         THE COURT:  Isn't the heart of the dissent mocking

1   the majority for saying how can you say this is

2   content-neutral?  The people who are allowed within the buffer

3   zone are only people who support abortion.  Ms. McCullen, who

4   opposes abortion had to stop at thirty-five --

5           MR. FUGATE:  That's correct.  Four of the judges

6   said -- did mock the fact that the majority found it was

7   content-neutral and the facts of the case were that the

8   abortion workers were able to walk with the patient, patron

9   and counsel them on their version while the people opposed to

10  abortion had to stop at the buffer zone.  I agree with the

11  dissent.  But that --

12          THE COURT:  Set that aside.  We follow the majority

13  and the majority said that the Massachusetts law was

14  content-neutral and therefore the question was given -- and

15  the Plaintiff agrees, given the significant interest in the

16  government that maintaining the unobstructive flow of traffic

17  in the roadways and on the sidewalks is an appropriate

18  interest.  The question really that they wrestled with in

19  deciding the fight, in deciding case, was was this narrowly

20  tailored and one of the arguments was that before the

21  legislature some of the evidence put into the record for the

22  district court to consider was that a police chief or some law

23  enforcement official said that it would be easier to -- it's

24  easier to enforce this unobstructed path into the abortion

25  clinic with this law, basically, and the five member majority

1    said, Well, you have all these other -- you have all these

2    other alternatives to ensure that women seeking these services

3    can get in there.  But you don't need a thirty-five foot

4    buffer to do that.

5          So my question to you is, you not only adopt the

6    within the roadway portion of the *Houston Chronicle* case that

7    the Fifth Circuit says is appropriate, you expand it far

8    greater than what the Fifth Circuit said was appropriate in

9    that *League City* case and I'm asking you, you seem to have at

10   your disposal ordinances or laws where you could ticket

11   Mr. Watkins if he is out there meandering through the traffic

12   and causing disruption that are tailored to that that does not

13   require as broad an ordinance as you have drafted.

14         **MR. FUGATE**:  There are a couple of things, Your

15   Honor.  One of them, as Mr. Watkins said from the stand, the

16   only two citations that were issued were for people who

17   actually did enter the roadway.  And there is an couple of

18   other things about the enforcement and how these were the only

19   two citations that were issued.  There's absolutely no

20   evidence that the only two citations issued went to the Open

21   Carry folks.

22         But in any event, the police use a warning strategy

23   and most people, most groups that set up these kind of things,

24   you go out, you warn them, they say thank you very much for

25   not giving us a ticket, and they leave.  The Open Carry group

1   has adopted a different strategy than that.

2          THE COURT:  That arguably would be their right.  I

3   mean, they don't -- because the police have come in that area

4   and given you a warning, if what -- if what we are

5   protecting -- here's my struggle with what you are saying.

6   The Supreme Court has said in this area that this First

7   Amendment is designed to protect the exchange of ideas, and I

8   think in the *Coakley* case they went even further and said if

9   it is the municipal -- the Government's view that they want to

10  protect citizens from communication that makes them

11  uncomfortable --

12         MR. FUGATE:  Yeah.

13         THE COURT:  -- if that's what the Government wants to

14  do, that is not allowed.  So the fact that -- so the fact that

15  people are uncomfortable that members of this group walk

16  around with AK 47s or rifles or shotguns or whatever might be

17  legal, that in and of itself is an inappropriate motivation

18  for the government to take any action against.

19         MR. FUGATE:  I agree with that, Your Honor.

20         THE COURT:  And you -- there's a whole history of

21  Ku Klux Klan cases where they are suing for their First

22  Amendment rights and many, many people take offense to that

23  and the courts say you can't -- you cannot legislate out

24  communication that is uncomfortable.  The press is here.  They

25  might write bad things about me.  Can I ask Arlington to

1    prohibit them from reporting on that --

2         MR. FUGATE:  I think Arlington can ask the press not

3    to get in the street to interview you.

4         THE COURT:  Okay.  But your ordinance doesn't limit

5    that.

6         MR. FUGATE:  What the ordinance limits, the ordinance

7    is designed to prohibit pedestrians from interacting with

8    motor vehicles in busy areas of Arlington.  That is what the

9    ordinance is designed to prohibit and the City believes that

10   it has narrowly tailored that to a limited number of

11   intersections and a limited number of very busy roadways.

12        THE COURT:  And I'm asking you explain to me what

13   evidence you all have that you feel requires you to not only

14   keep them out of the roadway that the Fifth Circuit says is

15   appropriate but to keep them off the sidewalk, improved

16   shoulder, and some of these other things.  Explain that to me.

17        MR. FUGATE:  And I will.  And I will talk about how

18   the ordinance is narrowly tailored.  There is nothing in our

19   ordinance that prohibits them from having the walks, walking

20   down sidewalks, carrying flags, carrying guns.  Nothing

21   prohibits any of that.  The ordinance is limited --

22        THE COURT:  But didn't Massachusetts make a similar

23   argument that nothing prohibited Ms. McCullen -- hold on --

24   prohibited Ms. McCullen from raising billboards and banners

25   and saying abortion is wrong, don't do this, but the Supreme

1   Court focused instead that Massachusetts was prohibiting her

2   from having a one-on-one interaction with folks so that she

3   could convey it in as, they describe it, a nice,

4   non-threatening conversational manner.

5       MR. FUGATE:   If the City of Arlington got a red paint

6   sprayer and went out along the edge of every one of our

7   sidewalks and painted a buffer zone where Open Carry could not

8   get within five feet of the roadway, it would be a comparable

9   a case to the *McCullen* case.

10      THE COURT:   But doesn't Section 15.03 say within 500

11  feet you can't get within this intersection.   And then in

12  another section it says within 1,000 feet you can't.   So three

13  football fields on these.   You can't get within 300 yards,

14  three football fields on these intersections.

15      MR. FUGATE:   The 1,000 foot areas are areas around

16  interstate interchanges and that is not -- that is not a

17  radius.   That's measured along the roadway.   We're not saying

18  there's a 1,000 foot circle around these intersections or a

19  500 foot circle around it.   We are saying along the roadway.

20      THE COURT:   But the ordinance that you say you

21  followed in the *Houston Chronicle* case, that intersection is

22  at Interstate 45, an interstate, just like Interstate 20,

23  Interstate 30, and FM 518.   So explain to me then why on a

24  busy intersection -- and the case you rely on is dead on

25  point -- I can attest to you personally having been at this

1    intersection for many years in my life --

2         MR. FUGATE:  Went to the University of Houston Law

3    School.  I've been there, too.

4         THE COURT:  518 and 45 is very busy.  Why is it that

5    Arlington took this ordinance as a model and added in some of

6    them 500 feet of -- a football field and-a-half barrier,

7    buffer zone, and in some 1,000 feet, a 300 yard barrier buffer

8    zone?

9         MR. FUGATE:  Some of the streets in Arlington and

10   I'll give you an example of Cooper, Collins, Division, some of

11   these streets are probably more than 100 feet wide.  So when

12   we talk about 500 feet, when you consider in multiples of

13   getting close to the intersection, it's not that much.  And --

14   that would be my first argument.

15        And the second is that in order to try to make

16   something that, you know, if we don't do it that way, then

17   they come and argue, Well, your statute is vague.  We don't

18   know where we can be, where we can't be, so we are trying not

19   to be vague.  The cases -- all these cases say that for a

20   content-neutral regulation it does not have to be the least

21   intrusive regulation.  It has to be narrowly tailored.

22        The City feels like we've have done that.  We have

23   pulled our ordinance back.  We amended it.  I think it's

24   narrowly tailored.  I think at least the Court can see that

25   there are limits on the ordinance.  It does not include every

1    traffic signal like -- and when I really focus heavily on the

2    *Houston Chronicle* case, I guess that's what I was focusing on,

3    that they limited it to every single traffic controlled

4    intersection, and we did not do that.  When I say ours is

5    more -- less restrictive than the *Houston* case, that's what

6    I'm referring to.

7         THE COURT:  Let me ask you to keep focusing on the

8    amount of traffic at these intersections, and I don't dispute

9    that, Abrams and 360, outside the G.M. plant, wasn't that an

10   issue as well in the *McCullen v. Coakley* case?  Didn't the

11   state and the plaintiffs, for that matter, argue about this

12   issue and don't you have an obligation -- in other words, the

13   plaintiff was saying, Look, we need to be where people are so

14   that we can make this communication to them, express our views

15   to them, try to dissuade them, whatever their arguments were,

16   so you are in effect, are you not -- so answer this, you are

17   in effect or are you not in effect sending these people in

18   this case and people generally away from the areas of the city

19   where they're going to have the most interaction with people

20   so that they can distribute their information to.

21        MR. FUGATE:  *McCullen* did not involve roadways or a

22   public safety issue.

23        THE COURT:  Wasn't that one of the arguments though?

24   One of the arguments from the state was we have to have this

25   barrier because if we don't have this barrier they're going to

1    back people up pulling people into the parking lot into the

2    street and that's going to obstruct the roadways and we have

3    an interest in ensuring the unobstructive nature of these

4    roadways?

5            MR. FUGATE:  None of the distributional literature,

6    none of the communication involved in *McCullen* was occurring

7    on a roadway or on the sidewalk.  This was a buffer zone

8    around the entrance to an abortion clinic and -- and one of

9    the other clinics that was also discussed, I think there was a

10   driveway where people pulled in.  But what we have in this

11   case is open -- open distribution and open interaction with

12   the drivers of vehicles on the busiest roads in Arlington and

13   I think that's distinguishable from *McCullen*.  I think the

14   *Houston Chronicle* case says that -- has already said that this

15   is a compelling interest.  That's the Fifth Circuit.  And so

16   we're in a -- we're in a different factual scenario than

17   *McCullen*.

18           THE COURT:  Is it -- is the *Houston Chronicle* case,

19   is it a compelling interest in part because these vendors are

20   giving newspaper -- selling newspapers to the drivers which

21   requires the -- which requires a business transaction; that

22   is, money has to change hands, the driver has to reach in

23   their pocket and hand money, they give money back to them,

24   they have to put that back in their pocket.  How is that

25   similar to what Open Carry wants to do, which as I understand

1    the testimony, they want to hand the Constitution, Second

2    Amendment rights, and some other literature.

3         MR. FUGATE:   There's two responses to that.   First of

4    all, the *Houston Chronicle* ordinance clearly includes the

5    distribution of literature.   That is in the ordinance that was

6    approved.   It's not limited to solicitation.   I acknowledge

7    that there are older cases, including the *Baton Rouge* case

8    that distinguish solicitation from distribution because you've

9    got this exchange of money.

10        But if you see those videos, what you see is people

11   running up to car, stepping into the busiest roadways, they've

12   got their hands in the cars, they are having an ongoing

13   conversation with these people.   This is not limited to,

14   Here's your Constitution.   I'm going to step back now and let

15   you drive away.   There is video-after-video-after-video that

16   shows the actual content of what this group is doing and I did

17   not have time in the two days that I filed a response to look

18   it all 100 hours, but I focused on the hours that were in

19   Arlington and I have cited line-by-line examples of what this

20   group is actually doing compared to what they are in this

21   courtroom saying they're doing.   And the *Harris v. Scott* case

22   talks a lot about that and that was in the context of a

23   summary judgment.   But when you've got video, you don't get to

24   come into court and say, Well, my conduct wasn't actually like

25   what's in the video.   My conduct was different because I'm

1   only at the pleading stage and I can alleged things in my

2   pleadings that aren't true.  The Supreme Court has done away

3   with that.  So even though this is the context of an

4   injunction, a preliminary injunction hearing, I would think

5   the same policy would apply that where there's actual video

6   showing the true context and the true content of what is

7   happening that that should be considered.

8           THE COURT:  I guess what I'm -- I'm not -- I don't

9   know if I'm ready though give up on the idea that and

10  solicitation and distribution aren't substantively different

11  for purposes of the First Amendment -- and this is why I'm not

12  ready though give up on it.  It seems to me that in the

13  *Coakley* case that the Supreme Court said handing out leaflets,

14  there is no greater form of speech, no greater form of speech

15  that is entitled to more protection than handing out leaflets

16  and -- Let me ask you this.  Do you agree that -- set aside

17  what you see on the videos, just from an antiseptic

18  perspective, someone handing a Constitution -- holding a sign

19  and saying do you want a Constitution, we support gun rights,

20  and they hand the Constitution to someone, that that is the

21  equivalent of leafletting?

22          MR. FUGATE:  Absolutely.

23          THE COURT:  Okay.  And so -- so to the extent that's

24  what they intend to do, that may not be what they're actually

25  doing according to these videos, but that's what they intend

1   to do, would you agree that's is the greatest form of speech

2   protected under the First Amendment?

3          MR. FUGATE:  I would not agree it is the greatest

4   form.  I would agree it is as great as any other form and I

5   would also --

6          THE COURT:  No greater form.  There is this no

7   greater form.

8          MR. FUGATE:  I agree that is American speech that is

9   protected form and in the government limits it the government

10  better have a good reason.

11         THE COURT:  Let's talk a little bit about the idea

12  that this is a content-neutral or content-based ordinance.

13  Your contention is what?

14         MR. FUGATE:  Number one, going back to 1994, there is

15  not one word in this ordinance from 1994 forward that has any

16  mention of any type of speech whatsoever.  I think another

17  case that we probably need to talk about is *City of Redondo*

18  *Beach*.  But that case, one of the things it stands for is a

19  Ninth Circuit case that involved solicitation.  We determined

20  facial -- whether an ordinance is content-neutral from in the

21  face of the ordinance.  There is just nothing there to show

22  any discrimination and when Open Carry came to us and

23  complained about our ordinance our response was to make our

24  ordinance less restrictive and I think that's another fact

25  that shows we are not trying to limit anyone's speech.  All we

```
1   want to do is limit the interaction of pedestrians and cars in
2   busy areas.  You know, the same day that this ordinance went
3   into effect we had a child killed, a pedestrian that was a
4   bystander struck by a car accident.  And I'm not -- we don't
5   have to go and say -- we don't have to wait until Kory is
6   injured.  We -- this is a public safety issue.  And people --
7   these interactions are on the street.  And you brought out a
8   really good point that there may not be an ordinance that's
9   exactly like Arlington's.  There's the City of Redondo Beach.
10  The ordinance in that case was so broad that they said that a
11  child selling lemonade on a residential street in front of
12  their house would have been prohibited.  So that ordinance was
13  facially overbroad and stricken down.  Then we have the
14  *Houston* case that says any intersection controlled by a
15  traffic signal.  And that's what we are trying to target, that
16  in our busiest streets.  Is it exactly the same as *City of*
17  *Houston*?  No.  Is this narrowly tailored?  Yes.  Are there
18  other places where they can do this?  Yes.  They did it just
19  two weeks ago on Little Road.  They have come to city hall
20  with their guns.  They have met with the press in front of
21  city hall.  They have had distributions in front of city hall.
22  Demonstrations in front of city hall.  Other roads in
23  Arlington.  They frequently meet in restaurants and they have
24  never, ever been cited for having a gun.  The only two
25  citations were for being in the road in busy areas.  So, is it
```

1    exactly the city of Houston?  No.  Does it seem really close?

2    I think yes.

3         THE COURT:  Do you -- the reading of the Texas

4    Transportation Code Section 552.0071, what is your position on

5    the interplay between your ordinance 15.02 and this portion of

6    the Transportation Code?

7         MR. FUGATE:  That's one of the reasons I asked

8    Mr. Watkins on the stand was if anyone had ever been cited

9    under this statute, and he wasn't sure.  But no one has ever

10   been cited on -- Arlington has not cited any of these folks

11   under the Texas Transportation Code.

12        THE COURT:  Okay.  Then perhaps my question wasn't

13   clear or perhaps I don't understand 552.0071.  As I -- hold

14   on.  As I understand this provision, the state legislature has

15   told all municipalities you cannot prevent a city employee --

16   I'm trying to find the exact language -- from engaging in

17   charitable solicitations.

18        MR. FUGATE:  Your Honor, and -- the language, if you

19   look at 552.0071, it's a mandatory state law.  The exact

20   language, the law begins, A local authority shall grant

21   authorization for a person to stand in a roadway to solicit

22   charitable contribution.  It's state law.  We have no control

23   over it.  It's our system of government, federal, state,

24   local.  We have to obey the state law.

25        THE COURT:  And so is this -- is this necessarily a

1    portion or a part of the city ordinance?

2           MR. FUGATE:  It has nothing to do with the city

3    ordinance.  The city ordinance does not reference it, the city

4    ordinance does not incorporate it, and there's no evidence of

5    the city enforcing it.

6           And I think there's one other case -- there's only

7    one case --

8           THE COURT:  What do you mean the city enforcing it?

9    That's really throwing me.  How can someone be ticketed under

10   this or the City enforce this?

11          MR. FUGATE:  The prior section, Your Honor, is

12   552.007.  It's a state law.  It limits people -- it prohibits

13   certain activities near roadways and 0071 is an exception to

14   that that's mandatory on the cities.

15          THE COURT:  And my question to you is under 0071 the

16   City cannot enact an ordinance that would prohibit --

17          MR. FUGATE:  We cannot --

18          THE COURT:  -- that would prohibit employees or

19   agents of the local authority, the City, unless it -- and they

20   would have to meet these requirements.  So you cannot enact an

21   ordinance, basically, that would say on Memorial -- Labor Day

22   coming up, firemen can't go out and meander through traffic

23   and solicit charitable contributions.  Is that right?

24          MR. FUGATE:  The state has imposed that on us and

25   that is correct.

1        THE COURT:  So that then is implicit in any ordinance

2    that you would enact that deals with people meandering through

3    the roadway.  Is that true or not true in your view?

4        MR. FUGATE:  I don't agree that it's true.  I believe

5    they are ships in the night, that this is a separate body, the

6    State of Texas is separate from the City of Arlington, this is

7    their had regulation, we do not ask for it, it has been

8    hoisted on us by the state --

9        THE COURT:  Whether you want it or not is another

10   thing.  There's a whole bunch of laws I don't really want but

11   they exist.

12       MR. FUGATE:  I agree that the City must comply with

13   that state law.

14       THE COURT:  And must permit under 15.02 any employee

15   or agent of the local authority to solicit charitable

16   contributions in the roadway.

17       MR. FUGATE:  If they follow the requirements, do the

18   permit --

19       THE COURT:  Well, do they have to follow the

20   requirements?

21       MR. FUGATE:  They do.

22       THE COURT:  In other words -- I don't know.  Does --

23   do you all have Jerry Lewis Boot things in the City of

24   Arlington --

25       MR. FUGATE:  There have been some and I can tell you

1   that, you know, as a result of the threatened litigation that

2   we -- we went back and we examined that, too.  And in the past

3   it was are an informal policy where our fire department would

4   notify our police department and they would let them know

5   where they were going to be and that's how it was done.  It

6   was done informally.  I admit that and now we are changing

7   that to where they have to go through a -- they have to do

8   all -- everything in writing.  It has to go through the city

9   manager.  We're in the process of implementing that and -- and

10  that is our current status of that.

11          THE COURT:  Hasn't the Attorney General opined in an

12  Attorney General opinion that 552.0071 is a content-based

13  statute because it permits charitable solicitations?

14          MR. FUGATE:  I had read that Attorney General opinion

15  once.  My reading of it was that they sort of say that in one

16  part and then in another part they say, You know, but we have

17  to look at the exact facts of the case, so we can't really

18  give you a true opinion.  So exactly what they say in that

19  Attorney General opinion I'm not sure, but seems to hint that.

20          THE COURT:  Well, but -- but you would agree or would

21  you agree with me that if Arlington had drafted an ordinance

22  that said what it says now in 15.02 except employees or agents

23  of the local authority can stand in the roadway to solicit

24  charitable contributions, that would be a content-based --

25          MR. FUGATE:  That would be a content-based

1    regulation.  There's -- before we leave the topic, there's

2    just one thing that I want to address on the Transportation

3    Code.  There is only one case that I found that has addressed

4    that.  Is it a Southern District case from Houston and it

5    interestingly also involved the City of League City.

6              THE COURT:  Right.

7              MR. FUGATE:  And the cite for it --

8              THE COURT:  I've got it.  *Coronelas De Las Famosas*?

9              MR. FUGATE:  Yes, Your Honor.

10             THE COURT:  Yes.

11             MR. FUGATE:  The only thing I want to point out about

12   that, what I was trying to allude to in the beginning, in that

13   case the City of League City was actually enforcing the 007

14   provision and that was part of the reasoning that the Court

15   found against the City because they were the ones enforcing

16   this statute.  We are not enforcing the statute, so that's a

17   difference.  Also in that case they did not leave one single

18   place in the city where the day laborers could solicit work.

19   So as an extreme example with zero alternative locations --

20   and what had happened was they had originally allowed the day

21   laborers to solicit work either on the police station property

22   or adjacent to it.  Some of the workers made cat calls to one

23   of the female officers and then after that the police chief

24   was just going to squash them out and so there is the one case

25   that interprets 007 and in that one case it was the City that

1   was enforcing the Transportation Code which we are not doing.

2            THE COURT:   Does -- just on this -- the last point on

3   this subject.   15.02(b) says that this section does not

4   relieve responsibility from compliance with all federal,

5   state, and local laws, ordinances and regulations.   Does that

6   incorporate in 552 or is that directed at something else?

7            MR. FUGATE:   Your Honor, as I indicated, I'm only

8   aware of one case that's addressed it.   The Attorney General

9   opinion --

10           THE COURT:   No.   No.   I'm talking about the

11  ordinance.   Your ordinance.   Arlington's ordinance.   15.02(b)

12  reads:   This section does not relieve responsibility for

13  compliance with all federal, state, and local laws,

14  ordinances, rules, and regulations.   My question to you is, is

15  the City of Arlington by section (b) here incorporating into

16  1502 552?

17           MR. FUGATE:   I don't believe so.   I believe that

18  restriction is incorporating restrictions.   That provision is

19  saying you can't violate any another restriction because of

20  this whereas the Texas -- the 0071 provision is not a

21  restriction, it's an exception allowing the conduct, so I

22  don't believe that, Your Honor.

23           THE COURT:   All right.   Did the City consider in

24  terms of its tailoring of this ordinance, did you consider

25  adopting some sort of protocol that would be modelled after

1    0071 to permit others to receive training, posting a million

2    dollar bond --

3          MR. FUGATE:  To be perfectly frank with the Court,

4    I'm a litigator.  I was not involved with the preparation of

5    the ordinance.  What was considered or not considered I don't

6    know.  I know that language is certainly not in the ordinance.

7          THE COURT:  Yes.  Okay.  Let me ask you this.  In

8    terms of the amendment to 15.02, the City amended it to

9    include in it the language to solicit or attempt to solicit

10    for purposes of an exchange with the occupants of a vehicle

11    and then you specifically define the word "exchange" to mean

12    exchanges used in its broadest sense and shall include the

13    giving of a ride, contribution, employment, or business.

14          MR. FUGATE:  Your Honor, I agree.  The City agrees

15    that, you know, this conduct of reaching into a car to hand a

16    Constitution, we agree that that falls within our -- our

17    belief of what the ordinance prohibits.

18          THE COURT:  Okay.  So in terms of the definition

19    here, just -- I'm just wondering, you all agree that the

20    purposes of an exchange as "exchange" is defined covers giving

21    someone a Constitution in a car in a roadway, explain to me

22    how it meets the definition factually.

23          MR. FUGATE:  Well, it the exchange and I think, again

24    that the videos really speak for themselves.

25          THE COURT:  No.  No.  No.  No.  Set that aside.  Set

1    the videos aside.  "Exchange" is used in its broadest sense

2    and shall include the giving of a ride.  That's not this.

3    Contribution, employment or business.  Is it your view that

4    this is a contribution?  Or how does -- how does what they're

5    doing -- set aside the videos.  The perfect world.  What they

6    want to do is someone stops at a red light and rolls down the

7    window and motions like that and they want to throw a

8    Constitution from the sidewalk into the car.

9              MR. FUGATE:  Throwing the Constitution from the

10   sidewalk into the car would not violate the ordinance.

11             THE COURT:  That's not an exchange in your view?

12             MR. FUGATE:  You know, that -- thinking about that

13   I'm not sure.  I'm not sure.

14             THE COURT:  So how -- then standing on the sidewalk,

15   the car pulls up to the red light at one of these

16   intersections, and they're holding a sign that says support

17   gun rights, let me give you a copy of the Constitution.

18   Someone rolls down their window and says I would like one and

19   they hand it to them, hand-to-hand, that is -- that meets the

20   definition of "exchange" in your view under 15.01?

21             MR. FUGATE:  It would and they would have to have

22   very long arms to do that.  It would be nearly impossible.

23             THE COURT:  Okay.  But explain to me factually now.

24   Let apply those facts, the hypothetical facts I just gave to

25   you, to this definition.

1          MR. FUGATE:   It's an exchange of -- we're trying to

2    read "exchange" broadly and what we're trying to regulate is

3    an interaction between pedestrians and vehicles.   That's what

4    we are trying to regulate.   That falls within that.   There's

5    some exchange of the Constitution.   There's an exchange of the

6    business card.   There's -- you know, this interaction between

7    pedestrians and cars is what we are trying to prohibit.

8          THE COURT:   Okay.   Very good.   Thank you.   What is

9    the purpose -- what was the evidence that the City had that

10   led it to conclude that this 500 feet amount was appropriate

11   at these intersections and the 1,000 feet amount was

12   appropriate at these other intersections?

13         MR. FUGATE:   Your Honor, I'm -- frankly, I'm not

14   aware of how that was determined.   I -- I don't know the

15   answer to that.

16         THE COURT:   Okay.

17         MR. FUGATE:   Other than we wanted an ordinance that

18   was not vague.

19         THE COURT:   Then I don't know if you have the same

20   answer or not to this question, but I want to -- reading

21   through it, I've been curious.   In section (d) of 15.03, the

22   two hour windows before and after the games, does that mean

23   that on these intersections at these times someone couldn't

24   hail a cab or hail one of those horse drawn buggies or the

25   bicycle driver with the -- with the place in the back for, you

1   know, sports patrons to sit, that sort of thing?

2          MR. FUGATE:  Your Honor, I'm not aware that anyone

3   considered that or even thought about that.

4          THE COURT:  I'm asking you, would that be allowed

5   under this ordinance on these places on Ball Park Way, Randall

6   Mill, road to Six Flags and Arlington Downs, those sorts of

7   things, would they be able to stop one of the shuttle buses

8   from one of those outlying parking lots, bicycle cab-type guy,

9   those sorts of things.  Would they violate the ordinance if

10  they did that within two hours on those intersections?

11         MR. FUGATE:  There are a couple of things that I

12  would point out is that the petty cabs are licensed.  These

13  are licensed vehicles and that's their purpose.  Certainly

14  that common duct is going on and I would have to --

15         THE COURT:  Going on within the two hours?

16         MR. FUGATE:  Absolutely.  I mean, there's no getting

17  around that.  The people are use petty cabs and I haven't

18  looked at the exact areas but I'm assuming in these areas and,

19  you know, that -- that may be something that I would have to

20  really look at the ordinance and study that but I don't deny

21  that that's going on.

22         As far as --

23         THE COURT:  But would that violate 15.02(a) of the

24  amended ordinance, the effective ordinance.

25         MR. FUGATE:  Your Honor, I would argue that it's not

1    an exchange, that hailing a cab, hailing a petty cab is

2    different than this exchange with the vehicle, and I think

3    that either a taxicab or a petty cab, these are licensed

4    vehicles.  They've gone through licensure or training --

5         THE COURT:  How is it not an exchange?  You just told

6    me a minute ago that you mean "exchange" to be defined in its

7    most broadest sense and I assume to hail a cab you will

8    exchange money.

9         MR. FUGATE:  Absolutely.  It doesn't occur -- the

10   exchange of money doesn't occur there on the street at that

11   moment, it occurs --

12        THE COURT:  It's got to stop and let you enter the

13   roadway and into the cab.

14        MR. FUGATE:  Your Honor, I'm going to be just as

15   frank as I can.  I have never seen a case that brought petty

16   cabs or taxicabs into this issue.  I've read about half a

17   dozen cases --

18        THE COURT:  It's not -- has a case said that 15.02

19   that a cab driver could be or a patron could be ticketed for

20   this.  That really is not the issue.  The issue is has

21   Arlington drafted an ordinance that either serves a compelling

22   interest or a substantial governmental interest and narrowly

23   tailored the ordinance and if -- and if some people are

24   allowed to do this and some people are not allowed to do this

25   does it really -- does the ordinance -- does the ordinance

1    alleviate the problem that the ordinance is designed to

2    tackle?

3           MR. FUGATE:  As far as vehicle transportation around

4    the stadiums, my understanding, and I don't take a cab to

5    them, and I have rarely ever seen cabs at any of our stadiums,

6    but that there are pick up and drop off zones for that kind of

7    thing.  There are pick up and drop off zones for buses --

8           THE COURT:  But are they in the areas prohibited by

9    15.03(d)?

10          MR. FUGATE:  They would not be on the street is my

11   understanding and, you know, the petty cabs, just being as

12   frank and honest as I can, I believe that those type of

13   exchanges probably would occur within the areas.

14          THE COURT:  Within the areas of 15.03(d)?

15          MR. FUGATE:  I believe that happens and whether or

16   not that's an exchange within the ordinance, I would -- I

17   don't believe anyone ever intended for that to fall within it

18   and I would argue that it's a different thing where there's --

19   you're just getting in and riding off as opposed to an

20   exchange happening on street.

21          THE COURT:  I've interrupted you and I want to be

22   sure that both sides that you all get to say anything that you

23   feel needs to be said in support of your argument.  So, do you

24   have any -- I'm going to give you that opportunity now.

25          MR. FUGATE:  The only thing that I would just like to

1    finish up with is that is there's a First Amendment case that

2    I think is relevant.  It's not relevant for the exact issues

3    that we're talking about, but it's relevant for the standard

4    for preliminary injunction and that case is *Palmer v.*

5    *Waxahachie Independent School District*, 579 F.3d 502, and it's

6    very standard in that it lists the same four elements that all

7    of these cases list which is substantial likelihood of

8    success, threat of irreparable injury, threatened injury

9    outweighs any arm, and grant will not disserve the public

10   interest.

11          The reason I think it's an important case is because

12   it talks about the fact in First Amendment cases where there's

13   a probable violation, the courts generally accept that as

14   meeting the factor of irreparable harm and I think Mr. Norred

15   cited another case that says that.  We don't dispute that,

16   that factor is generally met in First Amendment cases.  But

17   the reason the *Waxahachie* case is important is that it goes on

18   and looks at the other three elements and it does not grant

19   temporary relief because the other elements cannot be met.

20          We've had a big exchange about whether or not there's

21   a substantial likelihood of success and I believe instead of

22   me arguing that I will leave that element with the Court.

23          But there are two another elements and one is that

24   the threatened injury outweighs any potential harm and in this

25   case there is a public safety issue that the courts have found

1   is a compelling interest, not merely a significant interest.

2   And you heard testimony from Mr. Watkins that he is out there

3   with his six year old son and has personally witnessed and

4   approved his six year old son engaging in this conduct and

5   there have been some statements that we are all adults and we

6   take care of ourselves but that's not always the case.  And

7   there is also the distracted driver who causes an accident

8   with other drivers.  It may never be that someone in Open

9   Carry is injured.  It may be that someone else is injured.  It

10  may be another person pushing a child in a stroller that gets

11  injured.  So, is there a substantial disservice to the public?

12  I believe there is.

13        And the other issue is about, you know, whether

14  there's a harm though them.  And there are many other places

15  in Arlington where they can distribute the Constitution.

16  We're certainly happy for people in Arlington to have the

17  Constitution.  There's the city hall where they've been.

18  There's Little Road where they have been.  They have gone on

19  about their work.  They have many YouTube channel -- many

20  YouTube videos promoting their views and this isn't about

21  their views, it's about public safety and that's what I would

22  leave the Court with that I don't believe they can meet that

23  element.

24        THE COURT:  Thank you.  Anything else?

25        MR. NORRED:  Yes, Your Honor, if I might.  Just

1    responding.  We have agreed that the new law is less

2    restrictive but less restrictive than the old law --

3           THE COURT:  In what way?  How do you agree that --

4           MR. NORRED:  Well, we agree that the old law affected

5    the old city.  This new law effects not the entire city.  But

6    less restrictive does not equal constitutional and so they

7    took a law that was clearly unconstitutional want made it

8    something that's at least closer to the line.  I'm willing to

9    admit that.  But that doesn't mean it's constitutional.

10          You asked the question about 15.02(b) that talks

11   about all laws being incorporated.  It talk about prohibition,

12   it says all laws, state and federal laws.  By that 15.02(b)

13   they are incorporating their -- the process outlined in the

14   state Transportation Code.  Irrespective of whether they

15   wanted to, the text just says that.  It's undeniable.

16          The third issue and I mentioned this in document 13

17   which is my response to their reply, motive can be relevant in

18   a free speech claim.  For example, where Government restricts

19   speech based on its content or view -- may consider the

20   government's motive to determine whether the government has

21   impermissibly restricted speech just because the public

22   officials disapprove of the speakers views.  So it's not

23   controlling but it is relevant.  It is not a factor that was

24   present in *Houston Chronicle*.  It's clearly a factor in this

25   case where you have a slumbering dormant law for 18 years

1    suddenly is woken up and refreshed so it can be enforced

2    against a specific group.  We have this inner affidavit that's

3    part of the record.  There are car washes and people and cheer

4    leaders and football people on the side of every corner on

5    Saturday morning collecting money and urging -- trying to

6    distract you to come in and take a look at their car wash --

7            THE COURT:  In -- on these areas designated by 1503?

8            MR. NORRED:  Absolutely.  Absolutely.  It's routine

9    and it's common.  In eighteen years it's not been a problem.

10   And it's not being enforced against them today.  That's why

11   they hold the signs up.  You have people trying to sell tax

12   returns and they flip their signs around.

13           THE COURT:  But you can do that even under the

14   ordinance, but not within 1,000 or 500 feet.  But the City.

15           MR. NORRED:  Right.  But the City is arguing that

16   it's distracting because it's relevant.

17           THE COURT:  Yeah.  But they are not prohibiting that.

18   They may think -- in a perfect world they may say don't do

19   that there because it is distracting but they are not

20   prohibiting that conduct even within the 1 ,000 or 500 feet.

21           MR. NORRED:  I'm bringing it up only because they

22   think it's an important enough element to bring it up in this

23   hearing and say we should stop this.

24           THE COURT:  Okay.

25           MR. NORRED:  Just as a general note, cabs are not

1    allowed just to stop and pick you up.  If you are going

2    down -- if you are walk down Collins and you can't -- you're

3    not allow just to hail a cab and have it pull over and get in.

4    The idea that that's not an exchange, however, is absurd.

5           And the last thing on the no evidence -- denial of

6    threatened injury outweighs harm from injunction.  There's

7    been no evidence -- we provided evidence that hundreds of

8    walks have occurred.  Hundreds.  Nobody has even been cited

9    for impeding traffic, which is against the law.  And so for

10   them to say, Well, we've got Mr. Watkins saying he takes his

11   six year old -- he takes his six year old when they are not

12   giving out literature and opposing counsel has brought up

13   this -- that tragedy of the kids in the stroller.  They were

14   on the sidewalk or in the median.  They weren't doing anything

15   wrong.  Tragedies occur.  What we are talking about here is if

16   we are going to impermissibly restrict people from handing out

17   the Constitution because in the back of their brains they have

18   had -- they just don't like what the speech is and that's been

19   clear from the get-go even from the arguments being made today

20   and the questions being made today.  Why are you being rude to

21   cops?  Why are you carrying around a loaded weapon?  Why are

22   these things relevant?  I mean, I could have popped up and

23   said -- argued with that and said objection.  Why is opposing

24   counsel asking that question, because they don't like the

25   speech and that's the bottom line.

```
1              Thank you, Your Honor.
2         THE COURT:  Okay.  Thank you.
3      (Off to record discussion between Court and law clerk.)
4         THE COURT:  Okay.  I will get an order out directly.
5  I'm going to give some thought to your argument and I'll get
6  an order out just as soon as I can.
7              Thank you.
8              Anything else?
9         MR. NORRED:  No, Your Honor.
10        MR. FUGATE:  Your Honor, there is just one thing
11 about petty cabs.
12        THE COURT:  About -- what's that?
13        MR. FUGATE:  About petty cabs.
14        THE COURT:  Okay.  Yes.
15        MR. FUGATE:  I believe that technically the petty
16 cabs have stations where they are supposed to pick people up
17 and also that the taxicabs are not allowed to pick people up
18 on the street.  That's my understanding.
19        THE COURT:  Okay.  I think he just conceded that.
20 Yeah.  Okay.  Thank you very much.  So we're in recess on this
21 case.
22
23
24
25
```

1      I, **DENVER B. RODEN**, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6      **WITNESS MY HAND** on this 23rd day of July, 2014.

7

8

9                          /s/ Denver B. Roden

10                         **DENVER B. RODEN, RMR**
                           *United States Court Reporter*
11                         1050 Lake Carolyn Parkway #2338
                           Irving, Texas  75039
12                         *drodenrmr@sbcglobal.net*
                           **Phone:**  (214) 753-2298
13

14

15

16

17

18

19

20

21

22

23

24

25