UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| KORY WATKINS and OPEN CARRY TARRANT COUNTY, | § § § | |
| Plaintiffs, | § § | |
| | § | CIVIL ACTION NO. 4:14-cv-381-O |
| vs. | § § | |
| CITY OF ARLINGTON, | § § | |
| Defendant. | § § | |

DEFENDANT CITY OF ARLINGTON'S BRIEF
IN SUPPORT OF ITS  MOTION FOR SUMMARY JUDGMENT

Robert Fugate
Texas Bar No. 00793099
Assistant City Attorney
robert.fugate@arlingtontx.gov
City of Arlington City Attorney's Office
Mail Stop #63-0300
Post Office Box 90231
Arlington, Texas 76004-3231
(817) 459-6878 - Phone
(817) 459-6897 - Fax

Attorney for Defendant
City of Arlington

TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

I.    SUMMARY ...............................................................................................................1

II.   IDENTIFICATION OF LIVE PLEADINGS AND REMAINING CLAIM ..............3

III.  PROCEDURAL BACKGROUND AND DISCOVERY STATUS ..........................3

      A.  Procedural status ............................................................................................3

      B.  Discovery status .............................................................................................4

IV.   SUMMARY JUDGMENT STANDARD ...................................................................4

V.    ANALYSIS OF FACIAL CHALLENGE TO ORDINANCE ....................................7

      A.  Background on current ordinance ....................................................................8

      B.  Arlington's ordinance is content neutral on its face .......................................9

      C.  Effect of "Fill-the-Boot" State statute ............................................................9

      D.  Arlington's ordinance is narrowly tailored ...................................................13

      E.  Arlington's ordinance serves a significant government interest ...................15

          1.  Local data demonstrate significant interest ..........................................15

          2.  OCTC'S misstatement of accident data ...............................................19

          3.  National data demonstrate significant interest .....................................20

          4.  OCTC'S practice of tagging cars at red lights .....................................23

      F.  Arlington's ordinance leaves ample alternative channels of communication ......30

VI.   ANALYSIS OF ORDINANCE UNDER COMPELLING
      INTEREST STANDARD .........................................................................................37

VII.  CONCLUSION .......................................................................................................40

SIGNATURE ........................................................................................................40

CERTIFICATE OF SERVICE ...........................................................................40

<u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>

*Acorn v. City of Phoenix,*
798 F.2d 1260 (9th Cir. 1986) ........................................................................23

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)................................... 4-5

*Armstrong v. City of Dallas,*
997 F.2d 62 (5th Cir. 1993) ........................................................................ 6-7

*Celotex Corp. v. Catrett,*
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).................................. 4-7

*Clark v. Community for Creative Non-Violence,*
468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ............................. 2, 6-7

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
657 F.3d 936 (9th Cir. 2011) ........................................................................23

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,*
473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).................................2, 37

*Forsyth v. Barr,*
19 F.3d 1527 (5th Cir. 1994) ..........................................................................5

*Houston Chronicle Publ'g Co. v. City of League City, Texas,*
488 F.3d 613 (5th Cir. 2007) ............................................................ *in passim*

*Int'l Soc'y for Krishna Consciousness of New Orleans, Inc.*
*v. City of Baton Rouge*, 876 F.2d 494 (5th Cir. 1989) ........................... 2, 37-38

*Little v. Liquid Air Corp.,*
37 F.3d 1069 (5th Cir. 1994) ..........................................................................6

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1986).....................................6

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).......................................5

*McCullen v. Coakley,*
___ U.S. ___, 134 S.Ct. 2518, 189 L.Ed.2d 502 (June 26, 2014)............... 2, 7, 13-15, 37

*New York Times Co. v. Sullivan*,
376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) .........................................................38

*Topalian v. Ehrman*,
954 F.2d 1125 (5th Cir. 1992) .......................................................................................5

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*
460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1964) .........................................................38

*United States v. Grace*,
461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) .....................................................38

*United States v. Salerno*,
481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1985) .......................................................7

*Ward v. Rock Against Racism*,
491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ........................................ 2, 6-7, 14

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES:

U.S. CONST. amend. I .......................................................................................................3

U.S. CONST. amend. XIV ...................................................................................................3

42 U.S.C. § 1983 ............................................................................................................3

42 U.S.C. § 1988 ............................................................................................................3

FED. R. CIV. P. 1 ............................................................................................................7

FED. R. CIV. P. 56 ..........................................................................................................4

TEX. TRANSP. CODE § 552.007 ..................................................................................... 11-12

TEX. TRANSP. CODE § 552.0071 ................................................................................... 10-13

Boston, Mass., Municipal Code, ch. 16-41.2(d) (2103) ....................................................15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| KORY WATKINS and OPEN CARRY TARRANT COUNTY, | § § § | |
| Plaintiffs, | § § | |
| | § | CIVIL ACTION NO. 4:14-cv-381-O |
| vs. | § § | |
| CITY OF ARLINGTON, | § § | |
| Defendant. | § | |

## DEFENDANT CITY OF ARLINGTON'S BRIEF
## IN SUPPORT OF ITS  MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE O'CONNOR:

Defendant City of Arlington ("Arlington") files this brief in support of its motion for summary judgment in response to First Amended Verified Complaint.[1]   The Plaintiffs, Kory Watkins and Open Carry Tarrant County, are collectively referred to as "OCTC" in this motion.

### I.  SUMMARY.

1.01   Arlington moves for summary judgment on the only remaining claim in this lawsuit.  Specifically, Arlington moves for summary judgment on OCTC's facial challenge to Arlington's current ordinance.[2]  (The challenged ordinance is the first item in Arlington's Appendix in support of this motion and is referred to throughout Arlington's briefing as the "current ordinance".)[3]

---

[1]*See* First Amended Verified Complaint (ECF No. 38), filed Nov. 12, 2014.
[2]Appendix, COA MSJ APP pp.4-13.
[3]*See id.*

1.02    The government may enforce reasonable time, place, and manner regulations provided the restrictions are (1) content-neutral (justified without reference to the content of the regulated speech), (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication. *See McCullen v. Coakley*, ___ U.S. ___, 134 S.Ct. 2518, *2529, 189 L.Ed.2d 502 (June 26, 2014); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).  In this case, Arlington seeks summary judgment on all three elements.   The facts demonstrate that Arlington's ordinance is a reasonable time, place, and manner regulation as a matter of law.  In sum, Arlington seeks summary judgment that its current ordinance is facially constitutional.

1.03    Although it requires a higher standard, the government may also exclude speakers from a public forum when "the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."   *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also McCullen v. Coakley*, ___ U.S.   ___, 134 S.Ct. 2518, *2529, 189 L.Ed.2d 502 (June 26, 2014).  This higher standard applies to content-based regulations.  *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 497 (5th Cir. 1989).  The Fifth Circuit held that an ordinance with identical language "serves a compelling interest at the heart of the government's function: public safety."  *Houston Chronicle Publ'g Co. v. City of League City, Texas*, 488 F.3d 613, 622 (5th Cir. 2007).  If the Court finds that Arlington's ordinance is not content-neutral, Arlington seeks summary judgment on the additional ground that its ordinance

serves a compelling interest and that the ordinance is narrowly drawn to achieve that interest.   Arlington seeks summary judgment that its current ordinance is facially constitutional.

## II.  IDENTIFICATION OF LIVE PLEADINGS AND REMAINING CLAIM.

2.01   OCTC's live pleading is its First Amended Verified Complaint, filed November 12, 2014 (ECF No. 38).[4]   OCTC alleges that an Arlington traffic ordinance violates their right to free speech and expression, as protected by the First and Fourteenth Amendments.[5]   Plaintiff's claims are made pursuant to 42 U.S.C. §§ 1983 and 1988. Arlington's current live pleading – Defendant Arlington's Amended Answer to Plaintiffs' First Amended Complaint (ECF No. 40) – was filed on November 19, 2014.

2.02   The Court previously dismissed OCTC's as applied claims for lack of jurisdiction.[6]   OCTC's only remaining claim is a facial challenge to Arlington's current ordinance.[7]

## III. PROCEDURAL BACKGROUND AND DISCOVERY STATUS.

3.01   This suit has been developed both procedurally and through discovery.   A motion for summary judgment is proper for consideration at this time.

### A.  Procedural background.

3.02   OCTC previously filed a Combined Application for Preliminary Injunction and Temporary Restraining Order on May 28, 2014 (ECF No. 5).   The parties

---

[4]First Amended Verified Complaint, filed Nov. 12, 2014 (ECF No. 38).
[5]*Id.*, p.1.
[6]*See* Order (ECF No. 45), pp.1-2, 9-10, filed Jan. 8, 2015.
[7]*Id.*

filed competing briefing.[8]  The Court heard the application for temporary relief on July 7, 2014.  The Court preliminarily enjoined Arlington from taking any action to enforce the prior version of Section 15.02 of the Streets and Sidewalks Chapter of the Code of the City of Arlington until a final trial on the merits.[9]

3.03   On October 29, 2014, Arlington filed Defendant Arlington's Notice of Question of Mootness (ECF No. 33).  Arlington gave notice that it had amended the challenged ordinance and attached a copy of the new ordinance.  *See* Defendant Arlington's Notice of Question of Mootness (ECF No. 33).  Arlington then filed Defendant City of Arlington's Motion and Brief to Dismiss "As Applied" Claims For Lack of Jurisdiction (ECF No. 39) on November 18, 2014.  OCTC filed responsive briefing.[10]  The Court granted Arlington's motion to dismiss OCTC's "as applied" claims for lack of jurisdiction.[11]

**B.  Discovery status.**

3.04   The deadline for completing discovery expired on February 27, 2015.[12]

**IV.  SUMMARY JUDGMENT STANDARD.**

4.01   A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[8]*See* Memorandum in Support of Plaintiffs' Combined Application for Preliminary Injunction and Temporary Restraining Order (ECF No. 6), filed May 28, 2014; Defendant City of Arlington's Response and Brief in Opposition (ECF No. 11), filed June 2, 2014; Plaintiff's Reply to Defendant City of Arlington's Response (ECF No. 13), June 5, 2014.
[9]*See* Memorandum Opinion and Order, p.26, filed July 14, 2014 (ECF No. 19).
[10]*See* Plaintiffs' Response to City of Arlington's Notice of Question of Mootness (ECF No. 35), filed Nov. 10, 2014; Plaintiffs' Response to City of Arlington's Motion to Dismiss "As Applied" Claims for Lack of Jurisdiction (ECF No. 43), filed Dec. 8, 2014.
[11]*See* Order (ECF No. 45), pp.1-2, 9-10, filed Jan. 8, 2015.
[12]*See* Scheduling Order (ECF No. 25), p.1.

as a matter of law." FED. R. CIV. P. 56(a).   The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying the documents, if any, which the movant believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict.")   The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the nonmoving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 322-323.   A moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.* at 323, 325.

4.02    Once the moving party has carried its initial burden, the nonmoving party must do more than merely show that there is some "metaphysical doubt" as to the material facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (citing FED. R. CIV. P. 56(e)).   To meet this burden, the nonmovant must "identify specific evidence in the record" and "articulate the 'precise manner' in which that evidence support[s] their claim."  *Forsyth v. Barr*, 19 F.3d 1527,

1537 (5th Cir. 1994) (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)).

"Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian*, 954 F.2d at 1131. "Nor may non-movants rest upon mere allegations made in their pleadings without setting forth specific facts establishing a genuine issue worthy of trial." *Id*.

4.03    "The Supreme Court has instructed us that the purpose of Rule 56 is to 'enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990)). The Court does not, "*in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts*." *Id*. (citing *Lujan*, 497 U.S. at 888, 110 S.Ct. at 3188) (italics in *Little*).

4.04    Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552) (italics in *Little*). "Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Id*. at 1075-1076 (quoting *Armstrong v. City of Dallas*, 997

F.2d 62 (5th Cir.1993)) (italics in *Little*).  "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted."  *Id*. at 1076.

4.05  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting FED. R. CIV. P. 1).

## V.  ANALYSIS OF FACIAL CHALLENGE TO ORDINANCE.

5.01  The government may enforce reasonable time, place, and manner regulations provided the restrictions are (1) content-neutral (justified without reference to the content of the regulated speech), (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication. *See McCullen v. Coakley*, ___ U.S.  ___, 134 S.Ct. 2518, *2529, 189 L.Ed.2d 502 (June 26, 2014); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).  In this case, Arlington's ordinance meets each of these requirements as a matter of law.  Further, a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Houston Chronicle Publ'g Co. v. City of League City, Texas*, 488 F.3d 613, 616 (5th Cir. 2007) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

**A. Background on current ordinance.**

5.02    The Arlington City Council approved an amended ordinance on its final reading on October 28, 2014.[13]  Arlington's current ordinance has operative language identical to the operative language of § 78-39 of the City of League City Ordinance as addressed by the Fifth Circuit in *Houston Chronicle Publ'g Co. v. City of League City, Texas*, 488 F.3d 613, 616 (5th Cir. 2007).  Arlington's current ordinance provides:

> No person who is within a public roadway may solicit or sell or distribute any material to the occupant of any motor vehicle stopped on a public roadway in obedience to a traffic control signal light.  It is specifically provided, however, that a person, other than a person twelve years of age or younger, may solicit or sell or distribute material to the occupant of a motor vehicle on a public roadway so long as he or she remains on the surrounding sidewalks and unpaved shoulders, and not in or on the roadway itself, including the medians and islands.[14]

(This is the language referred to throughout Arlington's briefing as the "current ordinance".)  OCTC described the current language of the ordinance, saying: "The new rule can be summarized as allowing pedestrian-motorist interaction only when the pedestrian remains on the curb and off of the street."[15]  Arlington agrees that this summary captures the gist of the ordinance, except that OCTC's statement omits that the rule applies only at intersections controlled by traffic signals.[16]

5.03    Arlington relied on the language from the City of League City ordinance because the Fifth Circuit addressed the constitutionality of the language.  The Fifth Circuit addressed the language and stated: "Viewed in isolation," the ordinance language "is *not* facially unconstitutional."  *Houston Chronicle Publ'g Co.*, 488 F.3d at 622.  The

---

[13]Appendix, COA MSJ APP pp.12-13.
[14]Appendix, COA MSJ APP pp.12-13.
[15]First Amended Verified Complaint (ECF No. 38), p.6.
[16]*See* Appendix, COA MSJ APP pp.12-13.

Fifth Circuit further held that the operative language was "a reasonable means to narrowly tailor" the reach of the ordinance. *Id*. The Fifth Circuit stated that intersections requiring traffic signal lights were "generally the most heavily trafficked" and "the most dangerous." *Id*. The Fifth Circuit concluded that the "proscription serves a compelling interest at the heart of government's function: public safety." *Id*.

### B. Arlington's ordinance is content neutral on its face.

5.04    Arlington's current ordinance is content neutral.[17]    Nothing in the language of the current ordinance discriminates in favor of or against any speaker or any topic of speech.[18] In the *City of League City* case, the Fifth Circuit held that the exact language of Arlington's current ordinance was "stripped of any discriminatory context provided by the repealed provisions." *Houston Chronicle Publ'g Co*., 488 F.3d at 622. Accordingly, the Fifth Circuit held the district court erred in finding that the City of League City ordinance was unconstitutional.[19] The language of Arlington's current ordinance applies evenhandedly to every organization or individual, regardless of viewpoint, which would desire to solicit or sell or distribute material to the occupant of a motor vehicle on a public roadway.[20]

### C. Effect of "Fill-the-Boot" State statute.

5.05    The Fifth Circuit left one question unresolved in its analysis of the City of League City ordinance. *See Houston Chronicle Publ'g Co*., 488 F.3d at 622-623. Specifically, the Fifth Circuit did not address the effect of the Texas "Fill-the-Boot" statute. *See id*. On appeal, the newspapers argued that a Texas law – Texas

---

[17]Appendix, COA MSJ APP pp.12-13.
[18]*See id*.
[19]*Id*.
[20]*Id*.

Transportation Code § 552.0071 – "obligates the City to discriminate against them in applying" the City of League City ordinance. *Id*. at 622. The Fifth Circuit described the Texas law as requiring "local governments to allow municipal employees, such as firefighters, 'to stand in a roadway to solicit a charitable contribution', so long as such solicitors comport with other local requirements, such as posting a bond or obtaining a permit." *Id*. (quoting TEX. TRANSP. CODE § 552.0071.

 5.06 The Texas state law at issue provides:

**§ 552.0071. Local Authorization for Solicitation by Pedestrian**

(a) A local authority shall grant authorization for a person to stand in a roadway to solicit a charitable contribution as provided by Section 552.007(a) if the persons to be engaged in the solicitation are employees or agents of the local authority and the other requirements of this section are met.

(b) A person seeking authorization under this section shall file a written application with the local authority not later than the 11th day before the date the solicitation is to begin. The application must include:

(1) the date or dates and times when the solicitation is to occur;

(2) each location at which solicitation is to occur; and

(3) the number of solicitors to be involved in solicitation at each location.

(c) This section does not prohibit a local authority from requiring a permit or the payment of reasonable fees to the local authority.

(d) The applicant shall also furnish to the local authority advance proof of liability insurance in the amount of at least $1 million to cover damages that may arise from the solicitation. The insurance must provide coverage against claims against the applicant and claims against the local authority.

(e) A local authority, by acting under this section or Section 552.007,

does not waive or limit any immunity from liability applicable under law to the local authority. The issuance of an authorization under this section and the conducting of the solicitation authorized is a governmental function of the local authority.

(f) Notwithstanding any provision of this section, the existing rights of individuals or organizations under Section 552.007 are not impaired.

(g) For purposes of a solicitation under Subsection (a), a roadway is defined to include the roadbed, shoulder, median, curbs, safety zones, sidewalks, and utility easements located adjacent to or near the roadway.

TEX. TRANSP. CODE § 552.0071.

5.07    The newspapers argued this State law "imports discrimination into" the City of League City ordinance "against non-municipal, non-charitable organizations." *Houston Chronicle Publ'g Co.*, 488 F.3d at 623.   The Fifth Circuit noted that the newspapers did not make the "imported-into" argument in the district court.  *Id*.  Instead, the newspapers raised the argument for the first time on appeal.  *Id*.  The Fifth Circuit did not decide the issue because it was not properly before the Fifth Circuit.  *See id*.

5.08    When analyzing the effect of Section 552.0071, it is important to consider the statute in the context of Section 552.007 of the Texas Transportation Code.  Section 552.007 provides:

**§ 552.007. Solicitation by Pedestrians**

(a) A person may not stand in a roadway to solicit a ride, contribution, employment, or business from an occupant of a vehicle, except that a person may stand in a roadway to solicit a charitable contribution if authorized to do so by the local authority having jurisdiction over the roadway.

(b) A person may not stand on or near a highway to solicit the watching or guarding of a vehicle parked or to be parked on the highway.

(c) In this section, "charitable contribution" means a contribution to an organization defined as charitable by the standards of the United States Internal Revenue Service.

TEX. TRANSP. CODE § 552.007.  It seems, perhaps, that the real conflict is between Sections 552.007 and 552.0071 of the Texas Transportation Code.  Needless to say, Arlington does not promulgate and is not responsible for State law.

5.09    As a second notch in the analysis, it is notable that Section 552.007 of the Texas Transportation Code is much stricter than Arlington's current ordinance.  Section 552.007 appears – by its plain language – to apply to every roadway everywhere.  *See* TEX. TRANSP. CODE § 552.007(a) ("may not stand in a roadway").  Arlington's current ordinance only applies at intersections controlled by traffic lights.[21]  In another critical distinction, Sections 552.007 and 552.0071 make distinctions based on the context of the speech; the State law appears – on its face – to favor speech "to solicit a charitable contribution" over other speech.  *See* TEX. TRANSP. CODE §§ 552.007(a) & 552.0071. On the contrary, Arlington's ordinance makes no such distinction.[22]  Arlington's ordinance applies universally and is content neutral.[23]  Further, Arlington's ordinance does not provide any exception for any person or group.[24]

5.10    Arlington stipulates that it is bound to follow State law, including TEX. TRANSP. CODE § 552.0071.  But this does not make State law Arlington's law.  In complying with State law, Arlington is no different than any other person or entity.

---

[21]*See* current ordinance, Appendix, COA MSJ APP pp.12-13.
[22]*See* current ordinance, Appendix, COA MSJ APP pp.12-13.
[23]*See id.*
[24]*See id.*

5.11    A review of Section 552.0071(g) is also crucial to the analysis.   Section 552.0071(g) provides:

> (g) For purposes of a solicitation under Subsection (a), a roadway is defined to include the roadbed, shoulder, median, curbs, safety zones, sidewalks, and utility easements located adjacent to or near the roadway.

TEX. TRANSP. CODE § 552.0071.   Arlington's ordinance does not prohibit solicitation or distribution from the curbs, sidewalks, or utility easements adjacent to roadways at intersections.[25]   Much of the area barred by State law is not even regulated by Arlington.[26]   Thus, Arlington's ordinance – unlike State law – allows every individual and group to have at least some access to every intersection in Arlington.[27]

5.12    The *City of League City* case is clear that the ordinance language, standing on its own, is facially constitutional.   *See Houston Chronicle Publ'g Co.*, 488 F.3d at 620-623.   The same holding should apply to Arlington's ordinance.   Arlington's obedience to state law is a mandatory obedience.   In complying with Section 552.0071, Arlington does what it must.   Arlington is not the governmental entity that has created any content favoritism for any speech.   Accordingly, Section 552.0071 should not be "imported-into" Arlington's ordinance to destroy an otherwise valid time, place, and manner restriction that "serves a compelling interest at the heart of the government's function: public safety."   *Quoting Houston Chronicle Publ'g Co.*, 488 F.3d at 620-622.

**D.   Arlington's ordinance is narrowly tailored.**

5.13    Even legislative act's that are content neutral must still be "narrowly tailored to serve a significant governmental interest."   *McCullen v. Coakley*, ___ U.S.

---

[25]*See* current ordinance, Appendix, COA MSJ APP pp.12-13.
[26]*Compare id. with* TEX. TRANSP. CODE §§ 552.007 & 552.0071.
[27]*See id.*

___, 134 S.Ct. 2518, *2534, 189 L.Ed.2d 502 (June 26, 2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)) (internal quotation marks omitted in *McCullen*).  The *McCullen* Court explained the proper analytic process, saying:

> For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward,* 491 U.S., at 799, 109 S.Ct. 2746. Such a regulation, unlike a content-based restriction of speech, "need not be the least restrictive or least intrusive means of" serving the government's interests. *Id.,* at 798, 109 S.Ct. 2746. But the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.,* at 799, 109 S.Ct. 2746.

*McCullen v. Coakley*, 134 S.Ct. at *2535.

5.14   The Fifth Circuit has also previously held that the language of Arlington's current ordinance is narrowly tailored.  *Houston Chronicle Publ'g Co.*, 488 F.3d at 622. The Fifth Circuit held: "On its face, prohibiting street solicitations *only* at such intersections [that are controlled by traffic-signal lights] is a reasonable means to narrowly tailor § 78-39's reach."  *Id*. (italics in original).  The Fifth Circuit reasoned: "Such intersections (those requiring traffic-signal lights) are generally the most heavily trafficked."  *Id*.  "Therefore, they are the most dangerous."  *Id*.  The Fifth Circuit then said: "Accordingly, § 78-39's proscription serves a compelling interest at the heart of government's function: public safety."  *Id*.  It is notable that the Fifth Circuit held the ordinance met the higher compelling interest standard when only the significant interest standard was required.  *See id*. at 621-622.

5.15   In *McCullen*, the Supreme Court identified an ordinance regulating solicitation as one an example of several "less intrusive means" for the government to

address its concerns. *McCullen v. Coakley*, 134 S.Ct. at *2538 (slip op. at 24-25). The Supreme Court identified this less intrusive means in response to concerns of a "substantial public safety risk created when protestors obstruct driveways", raised by the State of Massachusetts. *Id*. Thus, the Supreme Court identified an ordinance generally similar to Arlington's current ordinance as an example of a lesser – not a greater – intrusion. *Id*. The "local ordinance" that the Supreme Court described as a lesser intrusion provided: "No person shall solicit while walking on, standing on or going into any street or highway used for motor vehicle travel, <u>or any area appurtenant thereto</u> (including medians, shoulder areas, bicycle lanes, ramps and exit ramps.)" *Id*. (quoting Boston, Mass., Municipal Code, ch. 16-41.2(d) (2013)) (underlining added). Arlington's ordinance is a proper example of a "less intrusive means of addressing its concerns." *See id*. Arlington's ordinance is a narrowly tailored ordinance under.

### E. Arlington's serves a significant government interest.

5.16   In enacting the current ordinance, Arlington relied on both local and national data that shows an epidemic of pedestrian deaths in roadways. As discussed below, this data included statistics of pedestrian deaths and injuries in Arlington, Texas as well as data for Texas and national data. This data is, unfortunately, consistent in showing alarming numbers of deaths and injuries to pedestrians in America's roadways.

### 1. Local data demonstrates significant interest.

5.17   In revising its ordinance, Arlington reviewed the number of pedestrian accidents and the severity of those accidents from January 1, 2009 through July 31,

2014.[28]   The data showed that there were substantial numbers of deaths and injuries to pedestrians in Arlington, Texas during this time period.[29]   Arlington included the following summary of the data in its current ordinance, stating:

> WHEREAS,   In the City of Arlington, Texas, police data shows that there were six-hundred and twenty-five crashes involving pedestrians from January 1, 2009 through July 31, 2014. Thirty-two pedestrians and one person in a vehicle were killed in these accidents.   Five-hundred and ninety-one other pedestrians were injured.   Ninety-four of the crashes occurred at intersections, including the death of four pedestrians and injuries to eighty-four other pedestrians.[30]

Thus, Arlington is not merely relying on data from other jurisdictions for its analysis. The Arlington police data shows that pedestrians are being injured and killed on Arlington roadways.

    5.18   Arlington also included a year-by-year breakdown of the data in its ordinance; the year-by-year summaries from 2009 through July of 2014 follow:

> WHEREAS,   in the City of Arlington, Texas, police data shows that there were one-hundred and one crashes involving pedestrians in 2009.   Seven pedestrians were killed in these accidents. Ninety-one additional people were injured in these crashes. Ten of the crashes occurred at intersections, including injuries to nine pedestrians.

> WHEREAS,   in the City of Arlington, Texas, police data shows that there were one-hundred and thirteen crashes involving pedestrians in 2010.   Two pedestrians and one person in a vehicle were killed in these accidents.   One-hundred and fifteen additional people were injured in these crashes. Fourteen of the crashes occurred at intersections, including injuries to thirteen pedestrians.

---

[28] *See* Staff Report, Exhibit 5, Pedestrian Crashes by Year and Month for Arlington, Texas, Appendix, COA MSJ APP pp.112-176.   *See also* current ordinance, COA MSJ APP pp.7-8.
[29] *See id.*
[30] *See* current ordinance, Appendix, COA MSJ APP, p.8.

WHEREAS,   in the City of Arlington, Texas, police data shows that there were one-hundred and sixteen crashes involving pedestrians in 2011. Six pedestrians were killed in these accidents. One-hundred and three additional people were injured in these crashes. Nineteen of the crashes occurred at intersections, including the death of one pedestrian and injuries to sixteen other pedestrians.

WHEREAS,   in the City of Arlington, Texas, police data shows that there were one-hundred and twenty-two crashes involving pedestrians in 2012. Eight pedestrians were killed in these accidents. One-hundred and fourteen additional people were injured in these crashes. Sixteen of the crashes occurred at intersections, including the death of one pedestrian and injuries to fourteen other pedestrians.

WHEREAS,   in the City of Arlington, Texas, police data shows that there were one-hundred and nine crashes involving pedestrians in 2013. Five pedestrians were killed in these accidents. One-hundred and three additional people were injured in these crashes. Twenty of the crashes occurred at intersections, including the death of one pedestrian and injuries to eighteen other pedestrians.

WHEREAS,   in the City of Arlington, Texas, police data shows that there were sixty-four crashes involving pedestrians in 2014 through the end of July 2014. Four pedestrians were killed in these accidents. Sixty-five additional people were injured in these crashes. Fifteen of the crashes occurred at intersections, including the death of one pedestrian and injuries to fourteen other pedestrians.[31]

5.19   The data from the Arlington Police Department also showed that a variety of factors lead to collisions between vehicles and pedestrians.[32] These factors were summarized in Arlington's current ordinance, which states:

WHEREAS,   In the City of Arlington, Texas, police data shows that injuries to pedestrians by crashes with automobiles are caused by a variety of factors, including: driver inattention, failure to yield right of way by drivers, failure to yield right

---

[31]*See* current ordinance, Appendix, COA MSJ APP pp.7-8.
[32]*See* Staff Report, Exhibit 5, Pedestrian Crashes by Year and Month for Arlington, Texas. COA MSJ APP pp.112-176. *See also* current ordinance, COA MSJ APP p.8.

> of way by pedestrians, distraction in the vehicle, improper
> start from parked position, under the influence of alcohol,
> impaired visibility, faulty evasive action, speeding,
> disregard of stop sign or light, failure to pass to left safely,
> cell/mobile phone use, unsafe speed, failure to control
> speed, unsafe backing, parked and failed to set brake, and
> turned improperly – cut corner. [33]

Many of these factors are simply out of the hands of the pedestrian.  Further, driver distraction is a factor that contributes to accidents in Arlington.[34]  Arlington identified one safety hazard occurring when pedestrians enter the roadways to interact with the occupants of vehicles.[35]  In its analysis, Arlington included photos of such conduct, which included photos of Open Carry Tarrant County members.[36]  The prevention of substantial numbers of pedestrian deaths and injuries provides a mandate to act that is both significant and compelling.  *See Houston Chronicle Publ'g Co.*, 488 F.3d at 622.

5.20    OCTC dismisses the deaths and injuries of pedestrians in Arlington as nothing more than an expected consequence of living in a growing community.[37] OCTC says: "the statistics do not show anything but a slowly increasing number of accidents over time that would be expected by a city with a growing population."[38]  The statistics that OCTC dismisses so easily show that thirty-two pedestrians were killed in Arlington, Texas in automobile collisions from January 1, 2009 through July 31, 2014.[39]  In addition, one person in a vehicle was killed.[40]  In addition to these deaths, another five-

---

[33]*See* current ordinance, Appendix, COA MSJ APP, p.8.
[34]*Id.*
[35]*Id.*
[36]*See* Staff Report, Exhibit 6, Appendix, COA MSJ APP pp.177-186.
[37]See First Amended Complaint (ECF No. 38) p.10, ¶46.
[38]*Id.*
[39]Appendix, COA MSJ APP p.8.
[40]*Id.*

hundred and ninety-one pedestrians were injured during this time period.[41]   Arlington does not agree with OCTC's callous interpretation that growing numbers of pedestrian deaths are simply to be expected in a growing community.

### 2.  OTCT's misstatement of accident data.

5.21    OCTC misstates the data cited by Arlington in its amended ordinance by confusing the summary for all data with the statement of data for the first seven months of 2014.[42]   OCTC seems to hope that their erroneous reading of the data can be bolstered into support for their position.   The misstatements appear in Plaintiffs' First Amended Verified Complaint (ECF No. 38), pages 9-10, filed Nov. 12, 2014.   Plaintiffs allege:

> The City also reports that in the first half of 2014, pedestrian-motorist collusion [sic] has inexplicably exploded to 626, with 94 crashes at intersections, and 88 deaths and injuries, ostensibly a ten-fold increase over previous years.
>
> No explanation is suggested by the City for such a huge change in the statistics over previous years.[43]

5.22    However, the explanation is simple: Plaintiffs' apparently misread the data cited in the ordinance.   It appears that Plaintiffs confused the data summary of <u>all</u> pedestrian crashes from January 1, 2009 through July 31, 2014, with the data for a seven month period in 2014 (January 1, 2014 through July 31, 2014).[44]   The data in the ordinance shows that from January 1, 2014 through July 31, 2014, there were sixty four crashes involving pedestrians, with four deaths and sixty-five additional injuries.[45]   The

---

[41]*Id.*

[42] *See* Plaintiffs' First Amended Verified Complaint (ECF No. 38), p.10, ¶¶41-42, 46 (filed Nov. 12, 2014).

[43]*See id.*

[44]Compare Arlington's new ordinance (Appendix COA MSJ APP p.8) with Plaintiffs' First Amended Verified Complaint (ECF No. 38), p.10, ¶¶41-42 (filed Nov. 12, 2014).

[45]*See* Arlington's new ordinance, Appendix, COA MSJ APP p.8.

data further showed, for January 1, 2014 through July 31, 2014, that fifteen of the collisions occurred at intersections, resulting in one the death of one person and injuries to fourteen additional people.[46]

5.23    Arlington has not argued that there was a sudden surge of pedestrian injuries.  Rather the data shows that pedestrians in roadways are often involved with collisions, resulting in injuries and deaths.[47]  This data is – unfortunately – consistent over a number of years.[48]  OCTC's sudden surge argument misrepresents the data and is meritless.

### 3.  National data demonstrates significant interest.

5.24    In addition to local data showing pedestrian deaths and injuries in Arlington, local and state data also show an epidemic of pedestrian deaths in both Texas and the United States.  Arlington reviewed national and state data during the process of adopting the current ordinance.[49]  The evidence showed disturbing trends of pedestrian deaths and injuries.[50]

5.25    With regards to the data from the U.S. Department of Transportation National Highway Traffic Safety Administration, the data showed that 4,432 pedestrians

---

[46]*Id.*, Appendix, COA MSJ APP p.8.
[47]*Id.*, Appendix, COA MSJ APP pp.7-8.
[48]*Id.*
[49]*See* Arlington's new ordinance, Appendix, COA MSJ APP pp.10-11; *see also* Staff Report Exhibit 10, National Highway Traffic Safety Administration Data, Appendix, COA MSJ APP pp.216-218; Staff Report Exhibit 11, Traffic Safety Facts – Pedestrians, 2012 Data, National Highway Traffic Safety Administration, Appendix, COA MSJ APP pp.219-229; Staff Report Exhibit 12, Pedestrian Traffic Fatalities by State, 2013 Preliminary Data, Prepared for Governors Highway Safety Association, Appendix, COA MSJ App, pp.230-247.
[50]*See id.*

died in traffic crashes in the United States in 2011, which was an increase over 2010.[51] The data further showed that an estimated 69,000 pedestrians were injured in traffic accidents in the United States, with 11,000 injuries occurring to people younger than fourteen years of age.[52]  The data showed that 4,280 pedestrians died in traffic crashes 2010, which was a four percent increase from 2009.[53]

5.26  Additional data from the U.S. Department of Transportation National Highway Traffic Safety Administration showed that 4,743 pedestrians died in traffic crashes in the United States in 2012, an increase of six percent from 2011.[54]  An estimated 76,000 pedestrians were injured in the United States in 2012.[55]  On average, a pedestrian was killed in a traffic crash in the United States every two hours and a pedestrian was injured every seven minutes in 2012.[56]  Pedestrian deaths accounted for fourteen percent of all traffic fatalities in the United States in 2012.[57]  Almost three-fourths (73%) of pedestrian fatalities occurred in an urban setting versus a rural setting.[58]

---

[51]*See* Arlington's new ordinance, Appendix, COA MSJ APP pp.10; *see also* Staff Report Exhibit 10, National Highway Traffic Safety Administration Data, Appendix, COA MSJ APP pp.217.

[52]*See id.*

[53]*See id.*

[54]*See* Arlington's new ordinance, Appendix, COA MSJ APP pp.10-11; Staff Report Exhibit 11, Traffic Safety Facts – Pedestrians, 2012 Data, National Highway Traffic Safety Administration, Appendix, COA MSJ APP pp.220.

[55]*See* Staff Report Exhibit 11, Traffic Safety Facts – Pedestrians, 2012 Data, National Highway Traffic Safety Administration, Appendix, COA MSJ APP pp.220.

[56]*See* Arlington's new ordinance, Appendix, COA MSJ APP pp.10-11; Staff Report Exhibit 11, Traffic Safety Facts – Pedestrians, 2012 Data, National Highway Traffic Safety Administration, Appendix, COA MSJ APP pp.220.

[57]*See id.*

[58]*See* Arlington's new ordinance, Appendix, COA MSJ APP pp.10-11; Staff Report Exhibit 11, Traffic Safety Facts – Pedestrians, 2012 Data, National Highway Traffic Safety Administration, Appendix, COA MSJ APP pp.221.

5.27    Data from the Governors Highway Safety Association showed that a fifteen percent increase in pedestrian deaths occurred from 2009 to 2012; however, there was a three percent decrease in all other motor vehicle deaths during this same period.[59] Further, the data showed an uneven distribution of pedestrian deaths among the states of the United States.[60]    The report showed that approximately one-third of the 4,743 pedestrian traffic deaths in the United States in 2012 occurred in just three states: California (612 deaths), Texas (478 deaths), and Florida (476 deaths).[61]   More than 4,000 pedestrian deaths occurred each year from 2000 through 2012.[62]   During the period of January through June of 2013, Texas had more pedestrian deaths (245) than any other state in the United States.[63]

5.28    The national and Texas data confirm that there is an epidemic of pedestrian deaths and injuries in the United States.   Unfortunately, Texas is one of the leading states for pedestrian deaths.   The data confirms that Arlington has a significant and compelling interest in protecting pedestrians.

---

[59]*See* Arlington's new ordinance, Appendix, COA MSJ APP p.11; *see also* Staff Report Exhibit 12, Pedestrian Traffic Fatalities by State, 2013 Preliminary Data, Prepared for Governors Highway Safety Association, Appendix, COA MSJ App, p.232.
[60]*See id.*
[61]*See* Arlington's new ordinance, Appendix, COA MSJ APP p.11; *see also* Staff Report Exhibit 12, Pedestrian Traffic Fatalities by State, 2013 Preliminary Data, Prepared for Governors Highway Safety Association, Appendix, COA MSJ App, pp.237-238.
[62]*See* Arlington's new ordinance, Appendix, COA MSJ APP p.11; *see also* Staff Report Exhibit 12, Pedestrian Traffic Fatalities by State, 2013 Preliminary Data, Prepared for Governors Highway Safety Association, Appendix, COA MSJ App, p.234.
[63]*See* Arlington's new ordinance, Appendix, COA MSJ APP p.11; *see also* Staff Report Exhibit 12, Pedestrian Traffic Fatalities by State, 2013 Preliminary Data, Prepared for Governors Highway Safety Association, Appendix, COA MSJ App, p.236.

**4.  OCTC's practice of tagging cars at red lights.**

5.29    OCTC's practice of tagging cars at red lights is not as benign as OCTC

alleges.[64]  OCTC describes its practices as:

> 12.  One of the common activities of Open Carry are [sic] group "walks"
> in which participants walk on sidewalks and providing [sic] pocket-
> sized copies of the United States Constitution to those individuals
> who indicate that they would like one, including those who are
> passengers of cars that are stopped temporarily at a stop light.

> 13.  Open Carry does not travel unbidden among stopped cars to ask for
> solicitations or distribute political material, but only approaches
> vehicles in which a driver or passenger has requested its literature,
> which is always material constituting political speech.[65]

In a similar case, one court described this general practice as "tagging", saying:

> "Tagging" usually involves an individual stepping into the street and
> approaching an automobile when it is stopped at a red traffic light. The
> individual asks the occupants of the vehicle for a contribution to ACORN
> and distributes a slip of paper, or "tag," providing information about
> ACORN and its activities.

*Acorn v. City of Phoenix*, 798 F.2d 1260, 1262 (9th Cir. 1986) (*overruled by Comite de

Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011)).

5.30    The photos that OCTC posts on the publicly accessible Open Carry

Tarrant County Facebook page paint a more accurate view of OCTC's conduct than the

complaint allegations.[66]  The pictures shown in this brief were taken directly from Open

Carry Tarrant County's publicly accessible Facebook page.[67]  All of the pictures are true

---

[64]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶¶12-13.
[65]*Id*.
[66]*Compare* First Amended Verified Complaint (ECF No. 38), p.3, ¶¶12-13 with the
photographs shown below.
[67]*See* Declaration, Appendix COA MSJ APP p.16, ¶¶ 3-4.

and accurate as posted by OCTC.[68]  Arlington has not modified any of the pictures in any way.[69]

     5.31    In the first example (shown below), an OCTC demonstrator has entered an interior roadway, with a retreat route between two commercial trucks.  As the photograph shows, the truck driver would have limited visibility of the OCTC member when she affects a retreat in front of the truck.  If the individual in the roadway is tagging a vehicle "stopped temporarily at a stop light" consistent with OCTC alleged practices,[70] this conduct would be prohibited under the current Arlington ordinance.[71]  (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.21 and Declaration, Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on June 30, 2014.  Appendix, COA MSJ APP p.21.)



---

[68]*Id.*
[69]*Id.*
[70]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶12.
[71]*See* Appendix, COA MSJ APP pp.12-13.

5.32    In the next example, and OCTC member has climbed on to the cab of a semi-trailer tractor to distribute literature.  The photograph shows the Open Carry Tarrant County member interacting with the driver of the truck.  If the individual in the roadway is tagging a vehicle "stopped temporarily at a stop light" consistent with OCTC alleged practices,[72] this conduct would be prohibited under the current Arlington ordinance.[73] (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.18 and Declaration, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on June 14, 2014. Appendix, COA MSJ APP p.18.)



---

[72]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶12.
[73]*See* Appendix, COA MSJ APP pp.12-13.

5.33    In the next example, an Open Carry Tarrant County member is in an interior lane of a roadway distributing literature while wielding a flag.  If the individual in the roadway is tagging a vehicle "stopped temporarily at a stop light" consistent with OCTC alleged practices,[74] this conduct would be prohibited under Arlington's current ordinance.[75]  (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.26 and Declaration, Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on May 16, 2014.  Appendix, COA MSJ APP p.26.)



---

[74]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶12.
[75]*See* Appendix, COA MSJ APP pp.12-13.

5.34    The following example shows Plaintiff Kory Watkins interacting with the occupants of a vehicle in a roadway.  If Mr. Watkins is in the roadway tagging a vehicle "stopped temporarily at a stop light" consistent with OCTC alleged practices,[76] this conduct would be prohibited under the current Arlington ordinance.[77]    (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.20 and Declaration, Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on June 21, 2014.  Appendix, COA MSJ APP p.20.)



[76]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶12.
[77]*See* Appendix, COA MSJ APP pp.12-13.

Arlington's Brief in Support of its Motion for Summary Judgment                    Page 27

5.35    The  final  example  also  shows  Open  Carry  Tarrant  County  member distributing  literature  in  the  roadway.    The  photograph  shows  the  Open  Carry  Tarrant County  member  interacting  with  the  driver  of  the  vehicle.    If  the  individual  in  the roadway is tagging a vehicle "stopped temporarily at a stop light" consistent with OCTC alleged  practices,[78]  this  conduct  would  be  prohibited  under  the  current  Arlington ordinance because the speaker is in the roadway.[79]  (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.23 and Declaration, Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on July 6, 2014.  Appendix, COA MSJ APP p.23.)



---

[78]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶12.
[79]*See* Appendix, COA MSJ APP pp.12-13.

5.36     The testimony of Kory Watkins at the hearing for temporary relief further confirms that OCTC's practices are not as limited as OCTC describes in its petition.[80] The testimony clearly shows that Open Carry Tarrant County members are interacting with vehicle drivers, not just passengers.[81]   Second, the testimony shows at least one documented instance when an Open Carry Tarrant County Member was in the roadway when a light was green.[82] Mr. Watkins testified:

Q.  Did you video one of the walks in Keller?

A.  Yes, sir.

Q.  And that was one of the main -- one of the top videos posted on your
    channel. Is that true?

A.  Yes. Come Take a Walk With Us.

Q.  Okay. And there's one point in that video where you encourage one of
    the open members -- Open Carry members – to move into an interior
    lane of traffic. Isn't that true?

A.  Yes. There was a lady who wanted our information. I got a little bit
    excited and told Daniel to go get her.

Q.  What you said was get 'em, Daniel, get her?

A.  Yes.

Q.  And traffic was starting to move at that time, wasn't it?

A.  I believe the light had just turned green and he handed it to them and
    came back just before the other cars started moving.

---

[80]*See* First Amended Verified Complaint (ECF No. 38), p.3, ¶¶12-13.
[81]Appendix, COA MSJ APP p.45, lines 1-22.
[82]*Id.*

Q.  Isn't it true you often interact with drivers not just the passengers

of vehicles?

A.  We interact with anybody who is wanting our information.

Q.  Including people behind the wheel, isn't that correct?

A.  It doesn't matter who they are. We interact with anybody who wants

our information.[83]

5.37    Both the example photographs and the testimony of Mr. Watkins demonstrate that OCTC's conduct involves active interaction with both drivers and passengers of vehicles while the Open Carry Tarrant County members are in the roadway.  Arlington's current ordinance prohibits this type of conduct whether it is by OCTC or any other group or individual.  The current ordinance is a content neutral safety regulation that is designed to prevent death an injury to pedestrians.

---

[83]*Id.*

**F. Arlington's ordinance leaves ample alternative channels of communication.**

5.38    Arlington's current ordinance is limited to prohibiting individuals from entering roadways at intersections controlled by traffic-signals. [84]  The current ordinance does not prohibit individuals from exercising other forms of speech at intersections controlled by traffic-signals.[85]  As long as individuals do not enter the roadways at the traffic-signal controlled intersections, they remain free to demonstrate at areas adjacent to the roadways. [86]  Arlington's current ordinance only applies where a motor vehicle is stopped "in obedience to a traffic control signal light."[87]  Arlington's current ordinance does not prohibit individuals from entering the roadways at intersections that are not controlled by traffic signals.[88]  Further, speakers can distribute literature to the occupants of vehicles so long as the speaker does not enter the roadway and is over twelve years of age.[89]  Thus, individuals in Arlington have ample alternative channels of communication.

5.39    Photographs from the Open Carry Tarrant County Facebook page confirm that speakers – in generally, and Open Carry Tarrant County members in particular – have ample alternative channels of communication.  These photographs are particularly helpful because they serve as visual representations of which conduct is allowed and which conduct is prohibited under the current version of the ordinance.

---

[84]Appendix, COA MSJ APP pp.12-13.
[85]*Id.*
[86]*Id.*
[87]*Id.*
[88]*See id.*
[89]*See id.*

5.40    The first photograph shows an Open Carry Tarrant County member demonstrating adjacent to a roadway.    Although Arlington does not encourage individuals to distract the drivers of vehicles, this conduct is not prohibited by the current ordinance.[90]  (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.20 and Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on June 22, 2014.  Appendix, COA MSJ APP p.24.)



---

[90]*See* Appendix, COA MSJ APP pp.12-13.

5.41    In the next example, Plaintiff Kory Watkins and other Open Carry Tarrant County members are shown demonstrating at the corner of Road to Six Flags Street and Collins Street in Arlington, Texas.  Because no person is in the roadway, this conduct would not be prohibited under the current Arlington ordinance.[91]  (Photograph copied from Open Carry Tarrant County's publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.16.)



---

[91] *See* Appendix, COA MSJ APP pp.12-13.

5.42    The following example shows an OCTC member demonstrating in Arlington, Texas with the AT&T Stadium in the background.  The individual is being filmed by the media.  The individual clearly has an effective alternative to deliver his intended message without entering the roadway of this Arlington intersection controlled by a traffic-signal.  The conduct shown in this photograph does not violate the current version of Arlington's ordinance.[92]  (Photograph copied from Open Carry Tarrant County website.  *See* Appendix, COA MSJ APP p.25 and Declaration, Appendix, COA MSJ APP p.16.  This picture was posted on Open Carry Tarrant County's Facebook page on May 27, 2014.  Appendix, COA MSJ APP p.25.)



---

[92]*See* Appendix, COA MSJ APP pp.12-13.

5.43    The next example, taken in North Richland Hills, Texas, demonstrates some conduct that would be prohibited under the current Arlington ordinance and other conduct that would not be prohibited.  The conduct occurring on the traffic island in the foreground would be prohibited, while the conduct off the roadway on the grassy area in the background would not be prohibited.[93] This example is specifically helpful in demonstrating that speakers retain ample alternatives for speech. (Photograph copied from the Open Carry Tarrant County publicly accessible Facebook page.  *See* Appendix, COA MSJ APP p.16.)



---

[93]*See* Appendix, COA MSJ APP pp.12-13.

5.44 The final example also shows an Open Carry Tarrant County member interacting with the occupants of a vehicle while he is in the roadway. However, the photograph also shows other members of Open Carry Tarrant County who have not entered the roadway. As the photograph shows, the vehicles are stopped in obedience to a red light. The individual in the roadway with the flag would be in violation of the current Arlington ordinance.[94] However, the other members of Open Carry Tarrant County who have not entered the roadway would not be in violation of the current ordinance.[95] (Photograph copied from Open Carry Tarrant County website. *See* Appendix, COA MSJ APP p.19 and Declaration, Appendix, COA MSJ APP p.16. This picture was posted on Open Carry Tarrant County's Facebook page on June 14, 2014. Appendix, COA MSJ APP p.19.)



---

[94]*See* Appendix, COA MSJ APP pp.12-13.
[95]*See id.*

5.45     The limited nature of the prohibition in the current ordinance demonstrates on its face that individuals have ample alternatives for speech in Arlington, Texas.  The photographs serve to demonstrate the ample alternatives.  Individuals are still free to demonstrate at traffic-controlled intersections so long as they do not enter the roadway. Likewise, are not prohibited from entering the roadway at intersections that are not controlled by traffic-signals.

5.46     For the reasons argued in this brief, Arlington believes that its current ordinance is a reasonable time, place, and manner regulation.  Arlington further believes that its current regulation is (1) content-neutral (justified without reference to the content of the regulated speech), (2) narrowly tailored to serve a significant government interest, and (3) leaves open ample alternative channels of communication.  Accordingly, Arlington seeks summary judgment that its current ordinance is facially valid.

## VI.   ANALYSIS OF ORDINANCE UNDER COMPELLING INTEREST STANDARD.

6.01     If the Court determines that Arlington's ordinance is not content-neutral based on the "imported-into" argument concerning the Texas state law, Arlington seeks summary judgment on the additional ground that the current Arlington ordinance satisfies the compelling interest standard.  Although it requires the higher compelling interest standard, the government may exclude speakers from a public forum when "the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."  *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see also McCullen v. Coakley*, ___ U.S. ___, 134 S.Ct. 2518, *2529, 189 L.Ed.2d 502 (June 26, 2014).  This higher standard applies to content-based regulations.  *Int'l Soc'y for Krishna Consciousness of New*

*Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 497 (5th Cir. 1989).   The Fifth Circuit previously held that the ordinance with identical language in the *City of League City* case "serves a compelling interest at the heart of the government's function: public safety." *Houston Chronicle Publ'g Co. v. City of League City, Texas*, 488 F.3d 613, 622 (5th Cir. 2007).  Thus, Arlington is entitled to summary judgment regardless of whether a significant interest standard (applicable to content-neutral regulations) or a compelling interest standard applies.  *See Houston Chronicle Publ'g Co.*, 488 F.3d at 621-622.  The Fifth Circuit has already held the language of Arlington's current ordinance serves a compelling interest.  *See id.*

6.02   The Fifth Circuit explained the difference between the two standards in *City of League City*, saying:

> The district court correctly stated the applicable law: streets are traditional public forums, *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); the sale of newspapers is a First–Amendment–protected activity, *see, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); therefore, in order to prohibit such activity in a quintessential public forum, a content-based regulation must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end"; and, when the regulation is content-neutral, it must also be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication", *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *USDC Opn.* at *4–5.

*See Houston Chronicle Publ'g Co.*, 488 F.3d at 621-622 (underlining added).

6.03   The Fifth Circuit's holding in the City of League City case that the ordinance served a "compelling interest at the heart of government's function: public safety" is demonstrated over and over by the pedestrian death an injury data cited by

Arlington.  *Quoting Houston Chronicle Publ'g Co.*, 488 F.3d at 622.  Arlington discussed this data at length in the previous section.  The data includes Arlington, Texas data, State of Texas data, and national data.  The evidence – all of it – points to the same conclusion: too many pedestrians are dying and being injured in America's roadways.  Arlington's ordinance is a simple, common sense solution that has been previously addressed by the Fifth Circuit.  Arlington chose the City of League City ordinance language so that it could find balance in protecting free speech rights and public safety.  The chosen language does exactly that.  Arlington's current ordinance only prohibits individuals from entering roadways at traffic controlled intersections.[96]   But even at those intersections, individuals remain free to demonstrate and distribute and solicit, as long as they do not get in the roadway.

6.04    Local governments are often compelled to walk a tight rope between federal law and state law.  This is certainly one of those cases.  There are competing needs.  Arlington must – and of course desires to – protect free speech rights.  But Arlington – as a local government – is in the best position to protect public safety.  Free speech is of no use to the thirty-two pedestrians that have died on Arlington roadways since 2009.[97]   Arlington has successfully found a way to protect both free speech and pedestrian safety.  Arlington's ordinance is the least restrictive mechanism to simply keep pedestrians out of the roadways of Arlington's busiest intersections.  In the event that the Court concludes Arlington's ordinance is not content neutral based on the impact of State law, Arlington prays that the Court will find Arlington's reasonable ordinance satisfies the compelling interest standard.

---

[96]*See* Appendix, COA MSJ APP pp.12-13.
[97]*See* Appendix, COA MSJ APP p.8.

## VII. CONCLUSION.

7.01    Arlington prays that the Court grant summary judgment in favor of Arlington on all remaining claims against Arlington by Kory Watkins and Open Carry Tarrant County and grant Arlington any further relief that is appropriate.

Respectfully submitted,

/s/ Robert Fugate
Robert Fugate
Texas Bar No. 00793099
Assistant City Attorney
City of Arlington City Attorney's Office
MS #63-0300
P.O. Box 90231
Arlington, Texas  76004-3231
Email: robert.fugate@arlingtontx.gov
Telephone: (817) 459-6878
Fax: (817) 459-6897
Attorney for Defendant
City of Arlington

CERTIFICATE OF SERVICE

On March 30, 2015, I electronically submitted the foregoing document, DEFENDANT CITY OF ARLINGTON'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I served a true and correct copy on the Plaintiffs' attorneys of record by electronic notice to all counsel of record via the ECF System for the Northern District of Texas.  *See* FED. R. CIV. P. 5(b)(2)(E) & Local Rule 5.1(d).

/s/ Robert Fugate
Robert Fugate